Vanessa REDGRAVE and Vanessa Redgrave Enterprises, Ltd., Plaintiffs,

v.

BOSTON SYMPHONY ORCHESTRA, INC., "John Doe," and "Richard Roe," Defendants.

Civ. A. No. 82–3193–K.

United States District Court, D. Massachusetts.

Feb. 1, 1983.

---

Daniel J. Kornstein, Kornstein Meister & Veisz, New York City, for plaintiffs.

Keith Long, Robert E. Sullivan, Herrick & Smith, Boston, Mass., for defendants.

Memorandum

KEETON, District Judge.

I.

Following cancellation by the Boston Symphony Orchestra ("BSO") of a series of concerts that she was to narrate, Vanessa Redgrave and Vanessa Redgrave Enterprises, Ltd. filed this suit. Plaintiffs allege that the concerts were cancelled because of opposition to Ms. Redgrave's publicly stated political views, in particular her views on Israel and the Palestine Liberation Organization. The complaint contains ten claims, six against the BSO and four against defendants whose identity is not yet known and who are alleged to have put pressure on the BSO to cancel the concerts. The claims against the BSO are the following: breach of contract claim requesting monetary damages (first claim); breach of contract claim requesting specific performance (second claim); tortious repudiation of contract claim requesting monetary damages (third claim); tortious repudiation of contract claim requesting specific performance (fourth claim); claim under 42 U.S.C. § 1986 (seventh claim); and claim under the Massachusetts Civil Rights Act (eighth claim).

Defendant BSO now moves to dismiss all claims against it under Rule 12(b)(6), Fed.R.Civ.P. In reviewing this motion for dismissal for failure to state a claim upon which relief may be granted, the court may consider only those facts and

allegations set forth in the complaint and must view them in the light most favorable to the plaintiffs. A claim will be dismissed only if plaintiffs are not entitled to relief under any set of facts they could prove, within the scope of the complaint. See *Harper v. Cserr,* 544 F.2d 1121, 1122 (1st Cir.1976). The facts as stated in the complaint are essentially as follows. Ms. Redgrave entered into a contract with the BSO on March 22, 1982 to narrate six performances of Stravinsky's "Oedipus Rex" scheduled in April, 1982. In late March and early April, unidentified defendants Doe and Roe threatened the BSO with "severe adverse consequences" if it did not repudiate and break that contract. Complaint, ¶ 32. Doe and Roe "made these threats ... because they disagree with Ms. Redgrave's public statements on public issues involving Israel and the Palestine Liberation Organization." *Id.,* ¶ 33. As a result of those threats, BSO did in fact cancel the contract, *id.,* ¶ 34, and that cancellation and the wrongful conduct of Roe and Doe have caused others subsequently to refrain from‑hiring Ms. Redgrave. *Id.,* ¶ 55.

Plaintiffs' claims against the BSO will be reviewed separately below.

## II.

### Breach of Contract Claim Requesting Monetary Damages

This claim states that the parties entered into a contract under which plaintiff Vanessa Redgrave Enterprises, Ltd. ("Enterprises") was to be paid $31,000 in exchange for Ms. Redgrave's services, that plaintiff Enterprises remained at all times ready and able to perform its obligations under the

contract, but that BSO repudiated the contract. BSO's repudiation is alleged to have caused others to refrain from hiring Ms. Redgrave. Monetary damages, including incidental and consequential damages, are requested.

Defendant BSO concedes that the complaint states a breach of contract claim, but argues that, as a matter of law, plaintiffs may "recover nothing more than the alleged $31,000 contractual fee." Defendant's Memorandum at 4. Because the BSO has offered to pay plaintiffs' $31,000 contractual fee, BSO argues that the claim must be dismissed.

■ BSO's argument, in effect, is that there is no set of facts plaintiffs could prove that would entitle them to incidental or consequential damages. The argument relies heavily on *Quinn v. Straus Broadcasting Group, Inc.,* 309 F.Supp. 1208, 1209 (S.D. N.Y.1970), where the court stated that "[t]he New York rule is that damages for breach of an employment contract are limited to the unpaid salary to which the employee would be entitled under the contract less the amount by which he should have mitigated his damages ...." Even assuming that the instant case is properly characterized as a breach of employment case, a point which plaintiffs apparently concede, and assuming further that the case would not be taken outside the "New York rule" by the specific allegation that the employment termination caused others to refrain from employing plaintiff, defendant has not demonstrated that the "New York rule" relied on by *Quinn* is also the Massachusetts rule.[1] The general Massachusetts rule of

---

1. Defendant cites *Dickson v. Riverside Iron Works, Inc.,* 6 Mass.App. 53, 57, 372 N.E.2d 1302, 1305 (1978), which states that "[t]he measure of damages recoverable by an employee wrongfully discharged before the expiration of an employment contract is the wages he would have earned under the contract less what he did in fact earn or in the exercise of proper diligence might have earned in another employment." That case, however, which did not involve allegations that the wrongful termination itself caused others to refrain from hiring the plaintiff, cannot be read to support the

broad proposition that consequential or incidental damages may never, as a matter of law, be allowed in a case such as this. Defendant also cites *McKenna v. Commissioner of Mental Health,* 347 Mass. 674, 199 N.E.2d 686 (1964). That case has more to do with mitigation of damages than with the questions at issue in this case. *Moddaloni v. Western Massachusetts Bus Lines, Inc.,* 422 N.E.2d 1379, 1386–87 (Mass.App.1981), although indicating that the measure of damages in employment termination cases is lost wages, does not state that all other damages are necessarily excluded. *Kolb*

contract damages was stated in the often-quoted case of *John Hetherington & Sons, Ltd. v. William Firth Co.,* 210 Mass. 8, 21, 95 N.E. 961, 964 (1911):

> The fundamental principle of law ... for breach of contract ... is that the injured party shall be placed in the same position he would have been in, if the contract had been performed, so far as loss can be ascertained to have followed as a natural consequence and to have been within the contemplation of the parties as reasonable men as a probable result of the breach, and so far as compensation therefor in money can be computed by rational methods upon a firm basis of facts.

■ In light of the fact that defendant has not demonstrated that the New York rule as stated in *Quinn, supra,* controls the case, I cannot say that, in terms of the *Hetherington* formulation, there is no state of facts plaintiffs could prove that would entitle them to consequential or incidental damages. For instance, if plaintiffs proved other employers refused to hire Redgrave after termination of the BSO contract because of that termination (that loss of the other employment "followed as a natural consequence" from the termination of the contract), that this loss of other employment would reasonably have been foreseen by the parties at the time of contracting and at the time of termination, and that damages are rationally calculable, then plaintiffs may be entitled to damages that include monies for loss of the other employ-

ment. Although plaintiffs certainly have a heavy burden to carry here, it cannot be said with certainty at this time that they will not be able to meet this burden.[2]

### III.

### Breach of Contract and Tortious Interference with Employment Claims Requesting Specific Performance

In their first claim, discussed directly above, plaintiffs allege breach of contract; in their third claim, they allege that the BSO committed a tort when it broke the contract "solely because of Ms. Redgrave's exercise of her fundamental statutory and constitutional rights of freedom of expression ...." Complaint, ¶ 22. In claims two and four, plaintiffs allege that they have no adequate remedy at law for the breach of contract and "tortious repudiation of ... contract" respectively, and request an order directing the BSO to reschedule the performances called for under the contract.[3]

Defendant argues that the specific performance prayed for here is barred by the United States Constitution and by common law. Because I agree that this court may not, under the common law, order specific performance in this case, it is unnecessary to reach the constitutional issue.

As the court noted in *Loeb v. Textron, Inc.,* 600 F.2d 1003, 1023 n. 34 (1st Cir.1979), "[u]nder traditional principles of contract law, courts normally do not enforce employment contracts with orders for specific performance." The policy is reflected in 34

---

*v. Goldring, Inc.,* 694 F.2d 869 (1st Cir.1982), similarly fails to state the rule that defendant contends controls here.

**2.** Defendant also argues that not limiting damages in this case to lost wages may unconstitutionally burden the Symphony's "First Amendment right of artistic control over casting and repertoire." Def. Reply Mem. at 8. The gist of this argument is as follows: "To allow recovery of incidental and consequential damages, whose nexus to a contract breach must always be in large measure speculative, impermissibly chills the exercise of those First Amendment Rights." Def. Mem. at 7. The simple answer to this is that the Massachusetts rule does not allow the awarding of speculative damages and so such damages, whether consequential, inci-

dental, or otherwise, will not be allowed. I note as well that defendant has failed to identify in its argument what exactly is the causal link, either in this case or more generally, between awarding "speculative" damages and chilling First Amendment rights.

**3.** The complaint at claims two and four does not specify the exact injunctive relief requested under those claims, and another form of injunctive relief besides rescheduling performances is included in the prayer for relief at the end of the Complaint. Plaintiffs, however, indicate in their Memorandum at 21 that the injunctive relief sought under claims two and four is specific performance.

M.G.L. ch. 214 § 1A, which excludes contracts for personal services from those that may be specifically enforced:

> The fact that the plaintiff has a remedy in damages shall not bar an action for specific performance of a contract, *other than one for purely personal services,* if the court finds that no other existing remedy, or the damages recoverable thereby is in fact the equivalent of the performance promised by the contract relied on by the plaintiff, and the court may order specific performance if it finds such remedy to be practicable.

(Emphasis added.)

 Plaintiffs argue correctly that the cases do not establish that specific performance is never to be granted in an employment contract case.[4] However, it is clearly true that specific performance in personal service cases is the exception, and plaintiffs offer no facts or argument, beyond the flat and unsupported assertion in their complaint that "plaintiffs have no adequate remedy at law," as to why specific performance is necessary or appropriate in this case. *Cf. Dewey v. University of New Hampshire,* 694 F.2d 1 at 5 (1st Cir.1982) (on specificity required in pleadings). Nor do plaintiffs cite any cases in which specific performance has been ordered in a situation even remotely similar to the situation here,[5] where an artistic organization would be forced to schedule a series of concerts in two cities involving literally hundreds of performing personnel, not to mention support personnel, in addition to Ms. Redgrave. Such a result would inevitably constitute the kind of "undue hardship upon one party" that itself may be reason to deny specific performance. See *Freedman v. Walsh,*

331 Mass. 401, 119 N.E.2d 419 (1954). Although it may be argued that it is premature to decide the question of specific performance, *see Valcourt v. Hyland,* 503 F.Supp. 630, 643 (D.Mass.1980) (decision is to be made "in the exercise of sound discretion in light of the facts and circumstances of the particular case"), I conclude that there is no set of facts within the scope of the complaint that, if proved, would entitle plaintiffs to specific performance, and therefore claims two and four must be dismissed.

## IV.

### Tortious Repudiation of Contract Claim

Plaintiffs' third claim alleges that the BSO broke the contract because of Ms. Redgrave's speaking out on Israel and the Palestine Liberation Organization, and that this conduct "constitutes a tort under common law." Complaint, ¶ 23. Although the complaint does not identify exactly what tort this is, plaintiffs' supporting memorandum advances two theories—that it is the tort of intentional infliction of emotional distress as described in *Agis v. Howard Johnson Co.,* 371 Mass. 140, 355 N.E.2d 315 (1976), or, alternatively, that it is the "tort," as yet unnamed, described in *Fortune v. National Cash Register Co.,* 373 Mass. 96, 364 N.E.2d 1251 (1977). Both contentions must be rejected.

### A.

 As to intentional infliction of emotional distress, I note, first, that nowhere in the complaint, as distinguished from the supporting memorandum, are the elements of this tort pleaded or even alluded to.[6] In

---

4. Plaintiffs also correctly point out that most of defendant's authorities are inapposite, as those cases and treatises reject specific performance in a situation where an employer attempts to force an artist to perform. Here, where the artist is willing to perform, the situation is quite different.

5. In comparison, specific performance is "usually granted with respect to contracts to convey land." *Raynor v. Russell,* 353 Mass. 366, 367, 231 N.E.2d 563, 564 (1967).

6. By comparison, plaintiffs' tenth claim, which is directed against defendants Doe and Roe, does at least suggest the elements of the tort of intentional infliction of emotional harm and does so name the tort. The absence of any such references in plaintiffs' third claim may suggest that plaintiffs' claiming intentional infliction of emotional distress by the BSO is an afterthought.

order for a plaintiff to prevail on a claim of intentional infliction of emotional distress, it must be shown: (1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was "extreme and outrageous," was "beyond all possible bounds of decency," and was "utterly intolerable in a civilized community"; (3) that the actions of the defendant were the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was "severe" and of a nature "that no reasonable man could be expected to endure it." *Agis v. Howard Johnson Company,* 371 Mass. at 145, 355 N.E.2d at 319. Plaintiffs have not pleaded these elements of the tort.

■ The flaw in plaintiffs' claim, however, is not merely one of deficient pleading; were that the case, the court would be inclined to allow plaintiffs to amend the complaint in order to plead the elements of the tort properly. But an amendment would be of little help here. It is the responsibility of the court in the first place to determine whether the conduct alleged may reasonably be viewed as extreme, outrageous and beyond all possible bounds of decency.[7] Taking as true the factual allegations of the complaint—including the allegation that the BSO repudiated the contract because of Ms. Redgrave's exercise of her First Amendment rights—there is simply no way that the BSO's conduct can reasonably be seen as "extreme and outrageous" and "beyond all bounds of human decency" as those phrases are defined by precedents bearing on this theory of action. The BSO's alleged behavior does not, for instance, rise to the level found sufficient to survive a motion to dismiss in *Armano v. Federal Reserve Bank of Boston,* 468 F.Supp. 674 (D.Mass.1979), where the plaintiff alleged that his employer systematically

harassed him by, *inter alia,* circulating rumors that he was suspected of stealing money and directing supervisory personnel to assign him to the lowest and most menial tasks. See *Boyle v. Wenk, supra* (defendant, in the course of investigating plaintiff's brother-in-law, harassed and terrified plaintiff, who had recently returned from hospital, by late night telephone calls and visits); *Agis, supra* (allegations that employer fired plaintiff at a meeting of all employees because "some stealing was going on" and plaintiff's name came first in the alphabet are sufficient to state a claim of infliction of emotional harm). The BSO's alleged conduct is neither the kind of systematic harassment nor the single but dramatically cruel incident that the courts have found to be sufficiently "outrageous" to sustain a claim of infliction of emotional distress. Contracts are frequently broken, and even willful breach is not unusual. But it is unusual, perhaps unprecedented, for such a breach to constitute the tort of infliction of emotional distress. The facts of the present case will not sustain finding the tort and therefore, if count three is seen as alleging the tort of infliction of emotional distress, it must be dismissed.

### B.

■ Plaintiffs suggest in the alternative that count three alleges a "tort" defined in *Fortune v. National Cash Register Co.,* 373 Mass. 96, 364 N.E.2d 1251 (1977), *McKinney v. National Dairy Council,* 491 F.Supp. 1108 (D.Mass.1980), and *Gram v. Liberty Mutual Insurance Company,* 429 N.E.2d 21 (Mass. 1981).

One flaw in this contention is that the cited cases present fact patterns markedly different from the facts in the present case. In *Fortune, McKinney* and *Gram,* long-term employees [8] who had been terminated for

---

7. See *Boyle v. Wenk,* 378 Mass. 592, 598 n. 11, 392 N.E.2d 1053, 1057 n. 11 (1979) ("[I]n a case alleging infliction of emotional distress, a two-step process is required—first the judge must determine whether the conduct may reasonably be viewed as extreme and outrageous, and second, ... the jury must determine whether

the conduct was in fact extreme and outrageous").

8. The plaintiff in *Fortune* had been employed by the defendant for at least six years when he was terminated, the *McKinney* plaintiff for 18 years, and the *Gram* plaintiff for 7 years.

what they believed were bad faith reasons sued their former employers. It is questionable that the principles developed in those cases should be extended to a case like this, where a short-term contract for services was apparently agreed upon but then terminated before it could start. See *Richey v. American Automobile Association,* 380 Mass. 835, 406 N.E.2d 675 (1980), where the court found that the considerations that led to the result in *Fortune* would not "be remotely applicable in the circumstances of the discharge of this probationary employee."

A second and more fundamental flaw in plaintiffs' contention is that *Fortune, McKinney* and *Gram* do not support a tort claim. Each of the cited cases concerns not tort remedies but whether remedies for discharge will be afforded an employee whose contract appeared not to prohibit the employer from discharging the employee at will. In *Fortune,* the court held that a bad faith termination can constitute a breach of the employment-at-will contract. The court refused to consider whether plaintiff might have a tort remedy precisely because, as in this case, a contract remedy was available. In *McKinney,* the court applied *Fortune* to a situation in which no enforceable contract existed,[9] and held that the at-will relationship there contained an implied covenant of good faith and fair dealing that was broken. In *Gram,* the court answered negatively the question whether to allow recovery for breach of contract of an employment at will where the employee was discharged without cause but also with no improper motive.

Plaintiffs' characterization of the claims established in *Fortune* and *McKinney* as "torts" is, in effect, an attempt to establish a cause of action not previously recognized in Massachusetts precedents by attaching a new label and urging that the label establishes an entitlement to rights and remedies not previously recognized. To permit such a contention to succeed would be to obscure significant substantive issues bearing upon the availability of contract and tort remedies.

Actions for breach of contract protect interests in having promises performed, and tort actions protect interests in freedom from harms incident to intrusions upon legally protected interests. See, *e.g.,* W. Prosser, *Torts* 613, § 92 (4th ed. 1971). The duties of conduct enforced in tort actions may or may not be based in part upon manifested promises, and the interests protected may or may not arise from relationships that involve contracts. *Id.* A contract for services may create a relationship between parties by reason of which the law recognizes a duty of reasonable care in performance that will support a tort action as well as an action for breach of contract. Massachusetts precedents establish the availability of a tort remedy in such circumstances.

> When a party binds himself by contract to do a work or to perform a service, he agrees by implication to do a workmanlike job and to use reasonable and appropriate care and skill in doing it. . . . The count in tort states a cause of action as well as the count in contract. Although the duty arises out of the contract and is measured by its terms, negligence in the manner of performing that duty as distinguished from mere failure to perform it, causing damage, is a tort.

*Abrams v. Factory Mut. Liability Ins. Co.,* 298 Mass. 141, 143–44, 10 N.E.2d 82, 83–84 (1937). *See also Attleboro Mfg. Co. v. Frankfort Marine, Accident & Plate Glass Ins. Co.,* 240 F. 573 (1st Cir.1917); *Previews, Inc. v. Everets,* 326 Mass. 333, 94 N.E.2d 267 (1950); *Damiano v. National Grange Mut. Liab. Co.,* 316 Mass. 626, 56 N.E.2d 18 (1944); *Dorr v. Massachusetts Title Ins. Co.,* 238 Mass. 490, 131 N.E. 191 (1921). Neither in these precedents nor elsewhere, however, is there support for the contention that repudiation of a contract is as well a tort.

---

**9.** More precisely, the situation was one in which the contract was unenforceable under the statute of frauds.

■ Rights are not to be determined by playing a game of labels. If the relationship of the parties is such as to support a cause of action in tort, that cause of action is not to be denied because the parties happened also to have made a contract. Conversely, a breach of contract is not, standing alone, a tort as well. And it cannot be converted into a tort merely by attaching to the contract, or to the breach, new labels that sound in tort. Calling a "breach of contract" a "tortious repudiation of contract" is no more helpful in identifying a ground of tort liability than would be an argument that every breach of contract—or perhaps every willful breach—is a tort. No precedent has been advanced by plaintiff that supports such a proposition.

Absent some identifiable tort theory, no reason appears for enlarging remedies for the breach of contract alleged in this case beyond those, supported by precedents, protecting the interest in having promises performed. Thus, I need not determine whether in some special circumstances conduct amounting to repudiation of a contract may also support an action in tort. Plaintiffs in this case have called attention neither to special circumstances of fact nor to precedents that would support such an action in tort.

## V.

### Claim Under 42 U.S.C. § 1986

■ In their sixth claim, plaintiffs allege that defendants Doe and Roe are liable under 42 U.S.C. § 1985(3) [10] for conspiring to deprive Ms. Redgrave of her right to express her political views and her right to equal protection of the laws and equal priv-

ileges and immunities under the laws. In their seventh claim, plaintiffs allege that the BSO is liable under 42 U.S.C. § 1986 because the BSO had knowledge that Doe and Roe's § 1985(3) violations "were about to be committed, had power to prevent or aid in preventing the commission of same, yet refused to do so." Complaint, ¶ 45. [11]

Defendant raises three objections to this claim. First, the defendant argues that the § 1985(3) claim in this case, which is the predicate for the § 1986 claim against the BSO, requires state action and no such state action is alleged. Second, defendant argues that plaintiffs do not belong to a class of persons protected by § 1985. Third, defendant contends that, even if plaintiffs have stated a cognizable claim under § 1985 against Doe and Roe, their § 1986 claim fails because, as a matter of law, the BSO had no power to prevent the § 1985 violation. Because I find that plaintiffs' § 1985(3) claim does not meet state action requirements, it is unnecessary to consider defendant's other arguments. [12]

The state action issue presents a question that has not been addressed directly by the Supreme Court. My review of the case law and the facts of this case, however, convinces me that were the Supreme Court to decide this case, the Court would conclude that plaintiffs' § 1985(3) claim must be dismissed for failure to allege state action.

An inquiry into the state action requirements of § 1985(3) properly begins with *Griffin v. Breckenridge*, 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971). The plaintiffs there were black citizens who, mistaken by defendants for civil rights workers, were stopped on a Mississippi

---

**10.** The relevant portion of § 1985(3) reads as follows: "If two or more persons in any State or Territory conspire ... for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, *or of equal privileges and immunities* ... the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators."

**11.** Section 1986 reads, in relevant part: "Every person who, having knowledge that any of the

wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses to do so, if such wrongful act *is committed, shall be liable to the party injured* ... for all damages caused by such wrongful act, which such person by reasonable diligence could have prevented ...."

**12.** But see note 16 *infra*.

highway, taken from their car and beaten. The defendants were two white, adult residents of Mississippi apparently acting as private citizens and not as representatives of the state. Plaintiffs brought a claim under § 1985(3) alleging that defendants' actions prevented them from seeking the equal protection of the laws and enjoying equal rights, privileges and immunities, including the right of freedom of speech. The District Court, relying on *Collins v. Hardyman,* 341 U.S. 651, 71 S.Ct. 937, 95 L.Ed. 1253 (1951), which in effect construed § 1985(3) as reaching only conspiracies under color of state law, dismissed the complaint for failure to state a cause of action. The Court of Appeals affirmed the judgment of dismissal.

In reversing, the Supreme Court severely questioned *Collins v. Hardyman,* although it stopped short of disapproving that case.[13] The Court determined, first, that the language, companion statutes, and legislative history of § 1985(3) all demonstrated that the statute encompasses private conspiracies. Second, the Court held that not all private conspiracies to commit tortious acts produced liability under § 1985(3), but only those that included, "as an element of the cause of action, the kind of invidiously discriminatory motivations stressed by the sponsors" of an amendment limiting the reach of § 1985(3), *id.* 403 U.S. at 101–102, 91 S.Ct. at 1798. The Court left undecided "whether a conspiracy motivated by invidiously discriminatory intent other than racial bias would be actionable under" § 1985(3). *Id.* at 102 n. 9, 91 S.Ct. at 1798 n. 9. Third, having found on the facts that the case before it clearly stated a cause of action under § 1985(3), the Court found in

the Thirteenth Amendment and the right to travel sources of Congressional power to reach the private conspiracy alleged. Thus, the Court found the particular application of § 1985(3) that was before it constitutional. It left for another day whether there might be other constitutional sources of Congressional power to reach other private conspiracies:

> ... the allegations of the complaint in this case have not required consideration of the scope of the power of Congress under § 5 of the Fourteenth Amendment. By the same token, since the allegations of the complaint bring the cause of action so close to the constitutionally authorized core of the statute, there has been no occasion here to trace out its constitutionally permissible periphery.

*Id.* at 107, 91 S.Ct. at 1801.

Thus, although *Griffin* clearly establishes that certain private conspiracies are reached by § 1985(3), it does not define precisely the scope of rights secured by the statute or assert that state action will never be required in a § 1985(3) case. That last fact led some courts after *Griffin* to decide that state action would be required when the rights involved were Fourteenth Amendment rights;[14] the First Circuit, however, has declined to decide the issue. See *Bricker v. Crane,* 468 F.2d 1228, 1233 (1st Cir.1972), *cert. denied,* 410 U.S. 930, 93 S.Ct. 1368, 35 L.Ed.2d 592 (1973).

Had the Supreme Court not spoken further on § 1985(3), the inference might be drawn that the Court would find no state action requirement applicable to the present case. Witness the breadth of statement of the *Griffin* Court when discussing the language of the statute:

**13.** The Court said: "Whether or not *Collins v. Hardyman* was correctly decided on its own facts is a question with which we need not here be concerned. But it is clear, in the light of the evolution of decisional law in the years that have passed since that case was decided, that many of the Constitutional problems there perceived simply do not exist." *Griffin,* 403 U.S. at 95–96, 91 S.Ct. at 1795.

**14.** *See, e.g., Dombrowski v. Dowling,* 459 F.2d 190, 195 (7th Cir.1972) (Stevens, J.) ("The breadth of [1985(3)'s] coverage is yet to be

determined, but three categories of protected rights have been plainly identified. *Griffin* gives express recognition to a black citizen's Thirteenth Amendment rights and to his federal right to travel interstate; the title of the statute expressly identifies the third category, namely, rights protected by the Fourteenth Amendment. We think the § 1983 cases make it clear that in this third category a 'state involvement' requirement must survive *Griffin*"); *Doski v. M. Goldseker Co.,* 539 F.2d 1326, 1333–34, 1334 n. 13 (4th Cir.1976).

This language is, of course, similar to that of § 1 of the Fourteenth Amendment, which in terms speaks only to the States, and judicial thinking about what can constitute an equal protection deprivation has, because of the Amendment's wording, focused almost entirely upon identifying the requisite "state action" and defining the offending forms of state law and official conduct. A century of Fourteenth Amendment adjudication has, in other words, made it understandably difficult to conceive of what might constitute a deprivation of the equal protection of the laws by private persons. Yet there is nothing inherent in the phrase that requires the action working the deprivation to come from the State. See, *e.g.*, *United States v. Harris,* 106 U.S. 629, 643, 1 S.Ct. 601, 612–13, 27 L.Ed. 290. Indeed, the failure to mention any such requisite can be viewed as an important indication of congressional intent to speak in § 1985(3) of *all* deprivations of "equal protection of the laws" and "equal privileges and immunities under the laws," whatever their source.

*Griffin,* 403 U.S. at 96–97, 91 S.Ct. at 1795 (footnote omitted).

The Court, however, has spoken further. In *Great American Federal Savings and Loan Association v. Novotny,* 442 U.S. 366, 372, 99 S.Ct. 2345, 2349, 60 L.Ed.2d 957 (1979), the Court, after reiterating that § 1985(3) does "provide a cause of action for damages caused by purely private conspiracies," went on to state that "[s]ection 1985(3) provides no substantive rights itself; it merely provides a remedy for violation of the rights it designates." Although the holding of the case—that a violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.,* may not be asserted through § 1985(3)—is fairly narrow, at the

heart of the Court's reasoning is the determination that § 1985(3) creates no substantive rights.[15] "Section 1985(3) ... *creates* no rights. It is a purely remedial statute, providing a cause of action when some otherwise defined federal right ... is breached ...." *Id.* at 376, 99 S.Ct. at 2351 (emphasis in original). In other words, § 1985(3) provides only a remedy to redress a deprivation prohibited by other federal law. In the context of the present case, this means that § 1985(3) does not encompass a claim against private persons for deprivation of First Amendment free speech rights. These First Amendment rights are otherwise assertable only against the state. *See, e.g., CBS, Inc. v. Democratic National Committee,* 412 U.S. 94, 114, 93 S.Ct. 2080, 2092, 36 L.Ed.2d 772 (1973). To allow them to be asserted through § 1985(3) against private individuals would be to use § 1985(3) to create new rights in contravention of *Novotny.*

Three cases in this circuit have considered the scope of § 1985(3) since *Novotny,* and each has either concluded or suggested that state action is still required when the predicate right is one that is otherwise assertable only against the state. In *Rice v. New England College,* 676 F.2d 9, 11 (1st Cir. 1982), the court, following *Novotny* to hold that Title VII rights cannot form the basis for a § 1985(3) action, noted that Fourteenth Amendment rights also could not be asserted through § 1985(3) because of the absence of state action. In *Amoco Oil v. Local 99, International Brotherhood of Electrical Workers, AFL–CIO,* 536 F.Supp. 1203 (D.R.I.1982), Chief Judge Pettine thoroughly analyzed recent developments in § 1985(3) law in deciding to dismiss for failure to state a claim a § 1985(3) action alleging interference with First Amend-

**15.** Justice White's dissent, joined by Justices Brennan and Marshall, recognizes this as key to the majority's reasoning. "The pervasive and essential flaw in the majority's approach ... proceeds from its characterization of the former statute as solely a "remedial" provision. It is true that the words 'equal privileges and immunities under the laws' in § 1985(3) refer to substantive rights created or guaranteed by

other federal law, be it the Constitution or federal statutes other than § 1985(3); .... However, § 1985(3), unlike a remedial statute such as 42 U.S.C. § 1983, does not merely provide a cause of action for persons deprived of rights elsewhere guaranteed ...." *Novotny* at 388–90, 99 S.Ct. at 2357–58 (White, J. dissenting).

ment rights. He concluded that the claim had to be dismissed because of the failure to allege state action.

In the present case, Amoco has alleged that the defendants violated its First Amendment right to associate freely with non-union contractors. However, it is well-settled that First Amendment rights are limitations upon state action only, not upon private conduct .... Because Amoco's complaint does not allege that state action was involved in this case, the Court finds that the complaint fails to state a claim for redress of First Amendment violations through § 1985(3).

*Id.* at 1215–16 (footnote omitted).

Similarly, in *Williams v. Northfield Mount Hermon School,* 504 F.Supp. 1319 (D.Mass.1981), Judge Freedman held that plaintiff's Fourteenth Amendment due process and equal protection claims asserted through § 1985(3) should be dismissed under Rule 12(b)(6) for failure to allege state action. *Id.* at 1329–30.

There have also been cases decided the other way. For instance, in *Scott v. Moore,* 680 F.2d 979 (5th Cir.1982), *cert. granted,* —— U.S. ——, 103 S.Ct. 442, 74 L.Ed.2d 599, a sharply divided *en banc* Fifth Circuit held that a First Amendment free association claim that otherwise met the requirements of § 1985(3) could be asserted through that statute even in the absence of state action. The court rejected the Seventh Circuit's holdings in *Dombrowski v. Dowling, supra* and *Murphy v. Mount Carmel High School,* 543 F.2d 1189 (7th Cir. 1976) (§ 1985(3) provides no remedy for private impairment of First Amendment speech and associational freedoms) on the

basis of the Supreme Court's express reasoning in *Griffin* and, in particular, the Court's language at 97 quoted earlier. The *Scott* majority went on to say:

We are not unmindful of the Supreme Court's statement in *Novotny,* that section 1985(3) "provides no substantive rights itself; it merely provides a remedy for violation of the rights it designates." 442 U.S. at 372, 99 S.Ct. at 2349. We also acknowledge that some commentators have read this statement as an implicit endorsement of the Seventh Circuit's position in *Dowling.* See Note, *Private Conspiracies to Violate Civil Rights,* 61 B.U.L.Rev. 1007 (1981). However, so long as *Griffin* remains viable, we are bound by its determination that section 1985(3) reaches all deprivations of equal protection, whatever their source.

*Scott* at 990.

The problem with this conclusion is that it does not harmonize *Griffin* and *Novotny,* as may be done by requiring state action in § 1985(3) cases where the underlying constitutional claim requires state action (*i.e.,* Fourteenth Amendment and First Amendment claims) and not requiring state action where the underlying claims do not require state action (*i.e.,* Thirteenth Amendment and right to travel claims). This approach incorporates the holdings of both *Griffin* and *Novotny* and gives independent utility to § 1985(3) beyond that of § 1983.

I conclude that plaintiffs' seventh claim, depending as it does on the sixth claim (§ 1985(3) claim), must be dismissed because of failure to allege state action in the sixth claim.[16] The dismissal will be without

---

**16.** Apart from any modification of *Griffin v. Breckenridge* that may have occurred in *Novotny,* plaintiff's claim encounters another obstacle under *Griffin v. Breckenridge* itself.

The constitutional shoals that would lie in the path of interpreting § 1985(3) as a general federal tort law can be avoided by giving full effect to the congressional purpose—by requiring, as an element of the cause of action, the kind of invidiously discriminatory motivation stressed by the sponsors of the limiting amendment.... The language requiring intent to deprive of *equal* protection, or *equal* privileges and immunities, means that there

must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action.[9]

403 U.S. at 102, 91 S.Ct. at 1798 (emphasis in original). In footnote 9 the Court went on to say that, based on the facts before it, it was not required to decide "whether a conspiracy motivated by invidiously discriminatory intent other than racial bias would be actionable" under § 1985(3). *Id.* at n. 9, 91 S.Ct. at n. 9. A number of lower court opinions have held, however, that a showing of racial animus is not required in a 1985(3) action and, in particular, that the statute protects groups discriminated

prejudice to plaintiffs reasserting the claim if discovery uncovers a good faith reason to plead state action in the sixth claim.

## VI.

### Claim under the Massachusetts Civil Rights Act

■ Plaintiffs' eighth claim alleges that defendants,[17] by interfering with Ms. Redgrave's First and Fourteenth Amendment rights and rights secured under Articles 1, 10, 16, and 19 of the Declaration of Rights of the Massachusetts Constitution,[18] have violated the Massachusetts Civil Rights Act, M.G.L. ch. 12, §§ 11H and *I* and are liable in damages.[19]

Defendant argues that this claim must be dismissed because plaintiffs have failed to allege that the BSO interfered or attempted to interfere with Ms. Redgrave's rights by

against because of their political beliefs and associations. See *Scott v. Moore, supra* at 991–92; *Means v. Wilson,* 522 F.2d 833 (8th Cir.1975), *cert. denied,* 424 U.S. 958, 96 S.Ct. 1436, 47 L.Ed.2d 364 (1976); *Glasson v. City of Louisville,* 518 F.2d 899 (6th Cir.1975), *cert. denied,* 423 U.S. 930, 96 S.Ct. 280, 46 L.Ed.2d 258 (1975); *Smith v. Cherry,* 489 F.2d 1098 (7th Cir.1973), *cert. denied* 417 U.S. 910, 94 S.Ct. 2607, 41 L.Ed.2d 214 (1974); *Cameron v. Brock,* 473 F.2d 608 (6th Cir.1973); *Action v. Gannon,* 450 F.2d 1227 (8th Cir.1971); *Local No. 1 (ACA) v. International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America,* 419 F.Supp. 263 (E.D.Pa. 1976); *Paton v. LaPrade,* 471 F.Supp. 166 (D.N. J.1979).

These cases lend some support to plaintiffs' assertion that the class "composed of persons who speak out publicly in support of the aspirations of the Palestinian people for political and national autonomy," Plaintiffs' Memorandum at 37–38, may be a class protected by 1985(3). I note, however, without deciding whether plaintiffs are members of a 1985(3) class, that if a class can be defined to consist of those on one side of a controversial issue, and 1985(3) can be used to penalize private actors on the other side of the issue who act against the class, then 1985(3) would appear to reach far beyond "the congressional purpose" discussed in *Griffin* at 102. Few of the cases, in fact, seem to suggest such an expansive role for 1985(3). *Glasson, Cameron,* and *Paton,* for instance, all involved state action, and *Means* and *Smith* involved, if not state action, something arguably close to state action. *Local No. 1,* although not involving state action, also did not involve a violation of the First Amendment, which the court reasoned would require state action, but instead involved a violation of statutorily protected free speech in a labor context. Besides *Scott,* only *Action* appears to involve the basic ingredients of the instant case—private action impairing free speech—and that case was decided eight years before *Novotny.*

**17.** Defendants Roe and Doe, in addition to the BSO, appear to be named in this claim.

**18.** These state constitutional provisions are as follows:

ARTICLE I. All people are born free and equal and have certain natural, essential and unalienable rights; among which may be reckoned the right of enjoying and defending their lives and liberties; that of acquiring, possessing and protecting property; in fine, that of seeking and obtaining their safety and happiness. Equality under the law shall not be denied or abridged because of sex, race, color, creed or national origin.

ART. X. Each individual of the society has a right to be protected by it in the enjoyment of his life, liberty and property, according to standing laws. He is obliged, consequently, to contribute his share to the expense of this protection; to give his personal service, or an equivalent, when necessary: but no part of the property of any individual can, with justice, be taken from him, or applied to public uses, without his own consent . . . .

ART. XVI. The liberty of the press is essential to the security of freedom in a state: it ought not, therefore, to be restrained in the commonwealth. The right of free speech shall not be abridged.

ART. XIX. The people have a right, in an orderly and peaceable manner, to assemble to consult upon the common good; give instructions to their representatives, and to request of the legislative body, by the way of addresses, petitions, or remonstrances, redress of the wrongs done them, and of the grievances they suffer.

**19.** M.G.L. ch. 12, § 11H states in relevant part:

Whenever any person or persons, whether or not acting under color of law, interfere by threats, intimidation or coercion, or attempt to interfere by threats, intimidation or coercion, with the exercise or enjoyment by any other person or persons of rights secured by the constitution or laws of the United States, or of rights secured by the constitution or laws of the commonwealth, the attorney general may bring a civil action for injunctive or other appropriate equitable relief in order to protect the peaceable exercise or enjoyment of the right or rights secured.

Section 11*I* provides a private right of action.

means of "threats, intimidation, or coercion." Defendant's Memorandum at 34. Defendant goes on to argue that the factual allegations of the complaint demonstrate that the BSO did not engage in threats, coercion, or intimidation, and that plaintiffs should not be allowed to bootstrap a breach of contract claim into a civil rights action. Defendant cites *Sutter v. Pitts,* 639 F.2d 842 (1st Cir.1981), where the court dismissed a civil rights action because it was essentially a domestic relations case that could not be heard in federal court.

*Sutter* is inapposite. Plaintiffs here have alleged, at the least, deprivations of constitutionally protected speech adequate to suggest that this case has a constitutional dimension that may implicate the state civil rights act. Whether plaintiffs will be able to demonstrate that the BSO, as distinguished from defendants Doe and Roe, coerced Ms. Redgrave, is a matter left for another time. Though I am troubled by the rather conclusory nature of the allegations of violation of civil rights protected by state law, and by uncertainties of the law defining those rights, I conclude that the motion to dismiss the eighth claim should be denied.

### ORDER

For the reasons stated in the Memorandum of this date, it is hereby ORDERED:

1. Defendant Boston Symphony Orchestra's motion to dismiss plaintiffs' second, third, fourth, and seventh claims is allowed, and those claims are dismissed.

2. Defendant Boston Symphony Orchestra's motion to dismiss is otherwise denied.