David J. RICE, Plaintiff,

v.

**COMMUNITY HEALTH ASSOCI-ATION d/b/a/ Jackson General Hospital, Defendant.**

No. CIV. A. 6:97–1169.

United States District Court,
S.D. West Virginia,
Parkersburg Division.

Sept. 29, 2000.

Jeffrey T. Jones, Charleston, WV, Jerald E. Jones, West & Jones, Clarksburg, WV, for Plaintiff.

Thomas R. Goodwin, Carrie G. Fenwick, Susan C. Wittemeier, Goodwin & Goodwin, Charleston, WV, for Defendant.

## MEMORANDUM OPINION AND ORDER

HADEN, Chief Judge.

Pending are the parties' cross motions for summary judgment. The Court **GRANTS** the motion of Defendant Community Health Association, d/b/a Jackson General Hospital (Hospital). Plaintiff's motion is **DENIED.**

### I. FACTUAL AND PROCEDURAL BACKGROUND

Dr. Rice and the Hospital entered into a five-year written employment agreement, which began on July 1, 1996 and was to end July 1, 2001. In late September 1997 the Hospital suspended Rice for alleged sexual harassment, refusal to treat certain patients, and other violations of the employment agreement and employee handbook.[1]

Rice's breach of contract action[2] was tried to a jury December 15 to 17, 1998, which returned a verdict in favor of Plaintiff for direct damages of $751,564, representing the entire value of Rice's remaining contract term, and $1,418,829 in future consequential damages. The Court entered judgment on the verdict and denied Defendant's motions for judgment notwithstanding the verdict or for a new trial. *Rice v. Community Health Ass'n,* 40 F.Supp.2d 788 (S.D.W.Va.1999). Defendant appealed.

Our Court of Appeals affirmed the jury's verdict as to the direct breach of contract damages, but vacated the award of conse-

---

1. After having heard all the evidence, the Court held as a matter of law that no evidence of sexual harassment or of assault was presented to sustain these claims.

2. The Court granted summary judgment for Defendant on Plaintiff's only tort claim, defamation. The Court held Plaintiff failed to establish (1) publication of the allegedly de-famatory letter presented to him by the Hospital, (2) a cause of action for compelled self-publication, (3) defamation by co-workers attributable to Defendant, or (4) a violation of the insulting words statute. *Rice v. Community Health Ass'n,* 40 F.Supp.2d 783, 785 (S.D.W.Va.1998).

quential damages and remanded for further proceedings on that issue alone. *See Rice v. Community Health Ass'n*, 203 F.3d 283 (4th Cir.2000). This Court allowed Rice to amend his Complaint to comply with the Appeals Court's direction, *see Rice v. Community Health Ass'n*, No. *6:97–1169 (S.D.W.Va. Mar. 28, 2000), and once* again, following substitution of new counsel for Rice. *See id.* (May 12, 2000).

Discovery is now complete and both parties have moved for summary judgment.

## II. DISCUSSION

### A. Summary Judgment Standard

Our Court of Appeals has often stated the settled standard and shifting burdens governing the disposition of a motion for summary judgment:

> Rule 56(c) requires that the district court enter judgment against a party who, "after adequate time for ... discovery fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." To prevail on a motion for summary judgment, the [movant] must demonstrate that: (1) there is no genuine issue as to any material fact; and (2) it is entitled to judgment as a matter of law. In determining whether a genuine issue of material fact has been raised, we must construe all inferences in favor of the [nonmovant]. If, however, "the evidence is so one-sided that one party must prevail as a matter of law," we must affirm the grant of summary judgment in that party's favor. The [nonmovant] "cannot create a genuine issue of fact through mere speculation or the building of one inference upon another." To survive [the motion], the [nonmovant] may not rest on [his] pleadings, but must demonstrate that specific, material facts exist that give rise to a genuine issue. As the *Anderson* Court explained, the "mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff[.]"

*Harleysville Mut. Ins. Co. v. Packer*, 60 F.3d 1116, 1119–20 (4th Cir.1995) (citations omitted); *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir.), *cert. denied*, 513 U.S. 813, 115 S.Ct. 67, 68, 130 L.Ed.2d 24 (1994); *see also Cabro Foods, Inc. v. Wells Fargo Armored Serv. Corp.*, 962 F.Supp. 75, 77 (S.D.W.Va.1997); *Spradling v. Blackburn*, 919 F.Supp. 969, 974 (S.D.W.Va.1996).

"At bottom, the district court must determine whether the party opposing the motion for summary judgment has presented genuinely disputed facts which remain to be tried. If not, the district court may resolve the legal questions between the parties as a matter of law and enter judgment accordingly." *Thompson Everett, Inc. v. National Cable Adver., L.P.* 57 F.3d 1317, 1323 (4th Cir.1995). It is through this analytical prism the Court evaluates the parties' motions.

### B. Consequential Damages for Lost Professional Opportunities

 West Virginia contract law authorizes two categories of damages in a breach of contract action. The first, compensatory damages, comprises those damages "as may fairly and reasonably be considered as arising naturally—that is, according to the usual course of things—from the breach of the contract itself." *Kentucky Fried Chicken of Morgantown, Inc. v. Sellaro*, 158 W.Va. 708, 716, 214 S.E.2d 823, 827 (1975). The second category is "indirect or consequential damages that arise from the special circumstances of the contract." *Desco Corp. v. Harry W. Trushel Constr. Co.*, 186 W.Va. 430, 434, 413 S.E.2d 85, 89 (1991). To recover consequential damages, "plaintiff must show that at the time of the contract the parties could reasonably have anticipated that these damages would be a probable result of a breach." *Id.* Whether special circumstances exist to show that consequential damages were within the reasonable con-

templation of the contracting parties is ordinarily a question of fact for the jury. *Id.* 186 W.Va. at 436, 413 S.E.2d at 91. Finally, all damages recoverable in a breach of contract action, including consequentials, must be proved with reasonable certainty. *Sellaro,* Syl. pt. 3, 158 W.Va. at 716, 214 S.E.2d at 828.

*Seeking consequential damages from the breach of* his employment agreement, Rice relied on an apparently unique application of these principles in *Redgrave v. Boston Symphony Orchestra, Inc.,* 855 F.2d 888 (1st Cir.1988). Actress Vanessa Redgrave's contract to narrate Stravinsky's "Oedipus Rex" was canceled by the Boston Symphony Orchestra (BSO) after protests over Redgrave's participation because of her support of the Palestine Liberation Organization. A jury found the BSO had breached Redgrave's contract and awarded consequential damages for harm to her professional career. *Id.* at 891–92. Considering this claim under Massachusetts contract law, the First Circuit distinguished Redgrave's asserted contract claim from a claim for damage to reputation, noting that Massachusetts, like "virtually all other jurisdictions" to consider the question, had held "damages for reputation are not available in contract actions." [3] *Id.* at 892.

Rather than a claim for reputation damages, Redgrave's was correctly characterized as a claim for consequential damages for the "loss of identifiable professional opportunities, which the parties could have reasonably have anticipated when they entered into the contract." *Id.* at 894. Redgrave did not claim her general reputation as an actress was tarnished, but rather that "a number of specific movie and theater performances that would have been offered to her in the usual course of events were not offered to her as a result of the BSO's cancellation." *Id.* at 893. As a further gloss, the court approved this formulation:

> [I]f plaintiffs proved other employers refused to hire Redgrave after termination of the BSO contract because of that termination (that loss of the other employment *"followed" as a "natural consequence" from the* termination of the contract), that this loss of other employment would reasonably have been foreseen by the parties at the time of contracting and at the time of termination, and that damages are rationally calculable, then plaintiffs may be entitled to damages that include monies for loss of the other employment.

*Id.* at 893 (quoting *Redgrave v. Boston Symphony Orchestra,* 557 F.Supp. 230, 234 (D.Mass.1983)).

Proof of causation is the linchpin of this cause of action. As the *Redgrave* court noted,[4] "The requirements for awarding consequential damages for breach of contract are designed to ensure that a breaching party pays only those damages that have resulted from its breach." *Redgrave,* 855 F.2d at 896. The *Redgrave* jury was *correctly instructed "to find that the BSO's cancellation was* a proximate cause of harm to Redgrave's professional career only if they determined that harm would not have occurred but for the cancellation and that the harm was a natural and probable consequence of the cancellation." *Id.* (internal quotation omitted). Plaintiff was required to show such losses were the result of the breach "rather than the result of other, independent factors." *Id.* And again, Redgrave was called upon to prove "any drop in Broadway offers was proximately caused by the BSO cancellation and not by the fact that producers independently were concerned with the same fac-

---

3. The *Redgrave* court observed that contract claims for reputation damage are generally disallowed because such damages are unduly speculative, difficult to ascertain, remote, and not within the contemplation of the parties. *See* 855 F.2d at 892–93.

4. This extensive reliance on *Redgrave* is necessary because no other court has awarded consequential damages for loss of professional opportunities.

tors that had motivated the BSO." *Id.* at 899–900. Redgrave had to show the "cancellation itself caused the difference in film offers rather than the problems as highlighted by the cancellation." *Id.* at 899.

When our Court of Appeals reviewed Rice's consequential damage claim, it opined that West Virginia courts, "generally hospitable to claims for consequential damages," would recognize a claim like Redgrave's. *Rice,* 203 F.3d at 288–89. The appeals court, however, rejected the jury award of consequential damages to Rice because he failed to allege a *Redgrave*-type claim, loss of identifiable professional opportunities, or to offer any evidence to this effect. *See id.* at 289. That court vacated the consequential damages award and the case was remanded for a new trial on that issue alone. *Id.* at 290.

Development of this portion of the case has now reached summary judgment stage. To survive the Hospital's motion, Rice must *identify at least one lost Redgrave-type professional* opportunity and raise a genuine question of material fact about each element of that claim. For reasons that follow, he cannot satisfy the burden.

### C. Rice's Claim for Loss of Identifiable Professional Opportunities

Rice identifies four professional opportunities, allegedly lost as a result of his wrongful termination by Jackson General Hospital. The Court considers each in turn.

#### 1. Ohio State University

 Rice moves for summary judgment based on rejection for a position with Emergency Care Associates of Columbus, Ohio in March 2000. On behalf of the practice group, Dr. Hoekstra wrote, "[A]t the present time we will be unable to offer you a position with us. Our group has

significant concerns regarding the incident at Jackson General Hospital that resulted in your termination." Rice argues this refusal would not have occurred but for his firing and was a natural and probable consequence of the Hospital's breach of his employment contract.

Dr. Hoekstra was one of Rice's expert witnesses at trial.[5] In deposition, Hoekstra testified Rice's attorney called him shortly before March 9, 2000 and explained:

> [B]ecause no one had actually turned [Rice] down for a job yet, he was having difficulty claiming damages.
>
> [The attorney] said, "If he would apply to your group, would you turn him down?" I said, "Yes." He said, "Well, let's do that." So what he did was he said, "He will be calling you and he will be sending you an application for you to review."

(Pl.'s Mem. in Supp. of his Mot. for Summ. J., Ex. A (Hoekstra dep.) at 12–13.)

Hoekstra also submitted an affidavit in which he averred:

> I then received a letter from Dr. Rice seeking employment with my group. I never forwarded Dr. Rice's resume to any other doctor in my group, nor did I discuss Dr. Rice's application with any doctor in my group. I turned down Dr. Rice's request. Even though Dr. Rice's application was not processed in the normal and customary manner, and the entire process was a rather contrived situation, the outcome would have been the same had he formally been reviewed by the entire group.

(Def.'s Renewed Mot. for Summ. J., Ex. C ¶ 4.)

The contrivance of the situation precludes its reasonable characterization as constituting a natural consequence of the

---

5. Hoekstra (and Dr. Lander, discussed below) "opined generally that an emergency room physician who was fired for sexual harassment or whose previous employer refused to comment on his qualifications would experience substantial difficulty obtaining a full-time position." *Rice,* 203 F.3d at 289.

breach of Rice's employment contract. As Hoekstra saw it,

> [Hoekstra]: My impression was [Rice or his attorney] wanted me to turn them down.
>
> Q: And you accommodated them?
>
> [Hoekstra]: I accommodated them.

(*Id.* at 25.) Further, because the job application was never presented to the group, as in the normal hiring process, Rice actually was not rejected for employment, (*id.* at 14–15), albeit *Hoekstra testified the practice group* had never acted on hirings in a way he did not anticipate. *Id.* at 15.

Hoekstra also testified that by the concerns about "the incident at Jackson General" which prevented offering Rice a position, he did not mean the wrongful firing, i.e., the breach, but rather the other factors he knew about. (*Id.* at 37.) "It's not because of why he got fired; it's because of, you know, if he got fired, something's got to be wrong with his interactions with the nursing staff and things like that are really quite telling." (*Id.* at 17.) Hoekstra agreed "independent concerns about Dr. Rice separate and apart from what did or did not happen to him by reason of the hospital" explained why he would not recommend hiring Rice. *Id.* "[The Hospital] may not have found a good reason to fire him and they may have been wrong in picking that reason, but usually if there's an employee interaction problem, that's going to mean that person's going to be a liability, not an asset." *Id.* In sum, Hoekstra averred, "*My decision to turn down Dr. Rice's application was not based upon Jackson General Hospital's breach of its contract with Dr. Rice,* but rather it was based upon the problems he had interacting with the staff at Jackson General Hospital." (Def.'s Renewed Mot. for Summ. J., Ex. C ¶ 5.)

Although Hoekstra emphasized the firing is "what brought those concerns to light," (Hoekstra dep. at 29), so the firing and the concerns share a "tight link," (*id.*), Hoekstra did not learn of the interaction problems when Rice applied for a job. Rather, before the trial when Hoekstra prepared for testimony as Rice's expert witness, he reviewed depositions of nurses, the termination letter (which was not otherwise disseminated), and other materials, and talked with Rice's attorney. (*Id.* at 19.) When Rice's application was received, Hoekstra did not need to make any independent inquiry about the circumstances of his losing his previous job because Hoekstra had "the nursing depositions and things that I went through," that is, his "previous knowledge," (*id.* at 18) provided to him by Rice in preparation for his expert testimony. On that basis, in fact, Hoekstra promised to write a rejection letter for Rice even before Rice applied.

Dr. Rice's rejection was not a natural and probable consequence of the Hospital's breach of his employment agreement; it was an accommodation, a contrivance, and a charade. Although Hoekstra would not have recommended to his practice group that they hire Rice, the firing merely highlighted Rice's staff interaction problems— problems Hoekstra knew about because he reviewed information Rice provided him as an expert witness and not because he received Rice's job application. Finally, Hoekstra testified the decision to turn down Rice "was not based upon Jackson General Hospital's breach of its contract with Dr. Rice." A reasonable jury could not find otherwise.

### 2. Montgomery Regional Hospital

Dr. Lander, the Director of Emergency Services at Montgomery Regional Hospital in Blacksburg, Virginia until April 1, 2000, also testified as an expert on Rice's behalf. (Def.'s Renewed Mot. for Summ. J., Ex. D, ¶ 3.) Lander was also contacted by Rice's counsel and asked if he would hire Rice and, if not, if he would write a letter to that effect. (*Id.* ¶ 4.) Lander wrote the requested letter. However, as he avers, Lander "did not have the authority to hire or fire physicians at Montgomery Regional

Hospital." (*Id.*) Instead, he would forward inquiries to the hospital's physician recruiter, but did not forward Rice's resume because of "concerns about the allegations made against Dr. Rice and the resulting lawsuit." (*Id.* ¶ 5.)

As with the Ohio State "rejection," this job action was a sham. It was not a rejection by a person actually empowered to hire physicians. It was not based on information gained from the job application process, but rather on information provided for Lander to serve as Rice's expert witness. Most important, it did not follow as a natural and probable consequence of Jackson General Hospital's breach of Rice's contract. Consequently, this is not a *Redgrave*-type lost professional opportunity.

### 3. Wilkes–Barre General Hospital

■ Rice states by affidavit that he spoke to an employee of a *locum tenens* agency who told Rice he had spoken with the Director of Emergency Medicine at Wilkes–Barre General Hospital and the Director told the agent, who told Rice that any future employment at the Wilkes–Barre Hospital was canceled because that hospital had learned the circumstances of Rice's termination at Jackson General. (Pl.'s Reply to Def.'s Mem. in Opp'n to Pl.'s Mot. for Summ. J., Ex. C, ¶ 3.) This testimony is double hearsay, which is beyond the pale of admissible evidence.[6] Opposing Rice's claim is the competent affidavit of Edward P. Brennan, Director of Practice Operations for Wyoming Valley Physicians Network, whose office maintains employment files for physicians who are working or have worked at Wilkes–Barre General Hospital. (Def.'s Renewed Mot. for Summ. J., Ex. A, ¶ 1.) According to Brennan, the records indicate Rice worked at Wilkes–Barre three days in January 1999, but no contracts or docu-

ments indicate Rice was to work there again. (*Id.* ¶ 2.) Ordinarily, if Rice had been scheduled to work again, a confirmation from the *locum tenens* agency would so indicate. (*Id.* ¶ 3.) Finally, Brennan avers he has no knowledge of the circumstances concerning Rice's termination at Jackson General, nor are there documents or notations in Rice's file concerning those circumstances. (*Id.* ¶ 5.) The evidence before the Court fails to raise a genuine issue of material fact as to whether a professional opportunity was lost to Rice at Wilkes–Barre General Hospital as a result of the breach of his employment contract by Defendant.

### 4. Western Baptist Hospital

■ Finally, Rice claims by affidavit he was scheduled for temporary employment at Western Baptist Hospital in Paducah, Kentucky in March 2000, but shortly before he was to work there he received a request for an explanation of his termination by Jackson General. Rice claims that after receiving his letter of explanation, Western Baptist canceled his remaining scheduled employment and this is, therefore, a lost professional opportunity due to Defendant's wrongful termination of his employment contract.

Dr. Fred Mushkat, Director of Emergency Physicians at Western Baptist Hospital, however, states in his affidavit that Rice's application was incomplete because he failed to complete the portion regarding lost privileges at any other hospital. (Def.'s Renewed *Mot. for Summ. J.*, Ex. B, ¶ 3.) Mushkat states Rice reported he had been exonerated, and Mushkat states "if that were the case, in my viewpoint I would accept Dr. Rice's application as modified." (*Id.*) Mushkat avers he requested copies of the court documents with respect to the litigation, but Rice "initially

---

6. On motions for summary judgment, "[s]upporting and opposing affidavits shall be made on personal knowledge, [and] shall set forth such facts as would be admissible in evidence[.]" Fed.R.Civ.P. 56(e). *See Maryland*

*Highways Contractors Ass'n, Inc. v. State of Maryland,* 933 F.2d 1246, 1251 (4th Cir.1991) (noting "hearsay evidence, which is inadmissible at trial, cannot be considered on a motion for summary judgment").

refused to provide a copy." Instead, Mushkat was told Rice stated *the documents were public record and the hospital could obtain* them; Rice himself had no such documents. "Neither I nor my staff," says Mushkat, "pursued obtaining the documents from the court files." (*Id.*)

The reason given by Mushkat for Western Baptist's decision not to hire Rice "was not based upon the litigation he had with Jackson General Hospital, but was premised upon Dr. Rice's refusal to complete the application and his conduct which appeared to be designed to confuse or deceive the hospital about his past." (*Id.* ¶ 4.) "It is my opinion," continues Mushkat, "that Dr. Rice's behavior and reaction to my request for a complete application was evidence of a character trait which I do not believe would be helpful in the Emergency Department at Western Baptist Hospital." (*Id.* ¶ 5.)

Although Rice contends his affidavit raises a genuine question of material fact about this lost opportunity, the issue is not what Rice believes the reason is for his not being hired, but the reason the hospital did not hire him. On this point, Dr. Mushkat could hardly be more specific: it was not the termination by Jackson General, but the refusal to provide the documents needed to complete and verify his application.

## III. CONCLUSION

Accordingly, Rice has failed to raise a genuine issue of material fact about any *Redgrave*-type lost professional opportunity which occurred as a result of his termination by Jackson General Hospital and which would, therefore, be an occasion for the award of consequential damages. Defendant's motion for summary judgment is **GRANTED.** Plaintiff's motion for summary judgment is **DENIED.**

The Clerk is directed to send a copy of this Memorandum Opinion and Order to counsel of record and to post this published opinion at http://www.wvsd.uscourts.gov.

### *JUDGMENT ORDER*

In accordance with the Memorandum Opinion and Order entered this day, the Court **ORDERS** the case be **DISMISSED** and **STRICKEN** from the docket.

The Clerk is directed to send a copy of this Judgment Order to counsel of record.