ORVILLE E. FORTUNE *vs.* THE NATIONAL CASH
REGISTER COMPANY.

Norfolk.    February 8, 1977. — July 20, 1977.

Present: HENNESSEY, C.J., KAPLAN, WILKINS, LIACOS, & ABRAMS, JJ.

*Contract,* Performance and breach, Contract of employment.

A written contract for employment at will contained an implied cove-
     nant of good faith and fair dealing, and a termination not made in
     good faith constituted a breach of the contract.  [100-105]
In an action to recover certain commissions allegedly due as a result
     of the sale of cash registers, evidence warranted a finding that ter-
     mination of the plaintiff's employment as a salesman was not made
     in good faith.  [105-106]
A salesman whose contract for employment at will was terminated in
     bad faith was not barred from recovery of a commission allegedly
     due him by the fact that he failed to follow a notice and grievance
     procedure set forth under the contract.  [106-108]
In an action to recover certain commissions allegedly due the plaintiff
     from his employer, this court did not consider the employer's con-
     tention that the plaintiff was barred from recovery because he failed
     to bring his suit within two years after the cause of action accrued
     as required by his employment contract where the employer did
     not raise the limitation period in its answer.  [108]

CONTRACT. Writ in the Superior Court dated June 15,
1971.

The action was tried before *Brogna, J.*

After review by the Appeals Court, the Supreme Judi-
cial Court granted leave to obtain further appellate review.

*David H. Locke* (*A. Arnold Lundwall* with him) for the
plaintiff.

*Andrew F. Lane* for the defendant.

ABRAMS, J.   Orville E. Fortune (Fortune), a former
salesman of The National Cash Register Company (NCR),
brought a suit to recover certain commissions allegedly
due as a result of a sale of cash registers to First National

Stores Inc. (First National) in 1968. Counts 1 and 2 of Fortune's amended declaration claimed bonus payments under the parties' written contract of employment. The third count sought recovery in quantum meruit for the reasonable value of Fortune's services relating to the same sales transaction. Judgment on a jury verdict for Fortune was reversed by the Appeals Court, *Fortune* v. *National Cash Register Co.*, 4 Mass. App. Ct. 386 (1976), and this court granted leave to obtain further appellate review. We affirm the judgment of the Superior Court. We hold, for the reasons stated herein, there was no error in submitting the issue of "bad faith" termination of an employment at will contract to the jury.

The issues before the court are raised by NCR's motion for directed verdicts.[1] Accordingly, we summarize the evidence most favorable to the plaintiff. *H.P. Hood & Sons* v. *Ford Motor Co.* 370 Mass. 69, 71 (1976).

Fortune was employed by NCR under a written "salesman's contract" which was terminable at will, without cause, by either party on written notice. The contract provided that Fortune would receive a weekly salary in a fixed amount plus a bonus for sales made within the "territory" (i.e., customer accounts or stores) assigned to him for "coverage or supervision," whether the sale was made by him or someone else.[2] The amount of the bonus was determined on the basis of "bonus credits," which were computed as a percentage of the price of products sold. Fortune would be paid a percentage of the applicable bonus credit as follows: (1) 75% if the territory was assigned to him at the date of the order, (2) 25% if the territory was assigned to him at the date of delivery and

---

[1] The defendant raised many of the same issues in its motion for summary judgment. While the motions may differ in other contexts, we treat them together for purposes of this appeal. See 10 C.A. Wright & A.R. Miller, Federal Practice and Procedure § 2713, at 406-411 (1973).

[2] Apparently, NCR's use of a "guaranteed territory" was designed to motivate "the salesman to develop good will for the company and also avoided a damaging rivalry among salesmen." D. Boorstin, The Americans: The Democratic Experience 202 (1973).

installation, or (3) 100% if the territory was assigned to him at both times. The contract further provided that the "bonus interest" would terminate if shipment of the order was not made within eighteen months from the date of the order unless (1) the territory was assigned to him for coverage at the date of delivery and installation, or (2) special engineering was required to fulfil the contract. In addition, NCR reserved the right to sell products in the salesman's territory without paying a bonus; however, this right could be exercised only on written notice.

In 1968, Fortune's territory included First National. This account had been part of his territory for the preceding six years; he had been successful in obtaining several orders from First National, including a million dollar order in 1963. Sometime in late 1967, or early 1968, NCR introduced a new model cash register, Class 5. Fortune corresponded with First National in an effort to sell the machine. He also helped to arrange for a demonstration of the Class 5 to executives of First National on October 4, 1968. NCR had a team of men also working on this sale.

On November 27, 1968, NCR's manager of chain and department stores, and the Boston branch manager, both part of NCR's team, wrote to First National regarding the Class 5. The letter covered a number of subjects, including price protection, trade-ins, and trade-in protection against obsolescence. While NCR normally offered price protection for only an eighteen-month term, apparently the size of the proposed order from First National caused NCR to extend its price protection terms for either a two-year or four-year period. On November 29, 1968, First National signed an order for 2,008 Class 5 machines to be delivered over a four-year period at a purchase price of approximately $5,000,000. Although Fortune did not participate in the negotiation of the terms of the order,[3] his name appeared on the order form in the space entitled

[3] Fortune was not authorized to offer the price protection terms which appeared in the November 27 letter, as special covenant A, par. 3, of his contract prohibited him from varying the prices of items.

"salesman credited." The amount of the bonus credit as shown on the order was $92,079.99.

On January 6, 1969, the first working day of the new year, Fortune found an envelope on his desk at work. It contained a termination notice addressed to his home dated December 2, 1968. Shortly after receiving the notice, Fortune spoke to the Boston branch manager with whom he was friendly. The manager told him, "You are through," but, after considering some of the details necessary for the smooth operation of the First National order, told him to "stay on," and to "[k]eep on doing what you are doing right now." Fortune remained with the company in a position entitled "sales support."[4] In this capacity, he coordinated and expedited delivery of the machines to First National under the November 29 order as well as servicing other accounts.

Commencing in May or June, Fortune began to receive some bonus commissions on the First National order. Having received only 75% of the applicable bonus due on the machines which had been delivered and installed, Fortune spoke with his manager about receiving the full amount of the commission. Fortune was told "to forget about it." Sixty-one years old at that time, and with a son in college, Fortune concluded that it "was a good idea to forget it for the time being."

NCR did pay a systems and installations person the remaining 25% of the bonus commissions due from the First National order although contrary to its usual policy of paying *only* salesmen a bonus. NCR, by its letter of November 27, 1968, had promised the services of a systems and installations person; the letter had claimed that the services of this person, Bernie Martin (Martin), would have a forecasted cost to NCR of over $45,000. As promised, NCR did transfer Martin to the First National account shortly after the order was placed.

---

[4] NCR has "sales support" employees in its computer division. Fortune apparently was the only person in his division — chain store sales — to be classified as "sales support."

Approximately eighteen months after receiving the termination notice, Fortune, who had worked for NCR for almost twenty-five years, was asked to retire. When he refused, he was fired in June of 1970. Fortune did not receive any bonus payments on machines which were delivered to First National after this date.

At the close of the plaintiff's case, the defendant moved for a directed verdict, arguing that there was no evidence of any breach of contract, and adding that the existence of a contract barred recovery under the quantum meruit count. Ruling that Fortune could recover if the termination and firing were in bad faith, the trial judge, without specifying on which count, submitted this issue to the jury. NCR then rested and, by agreement of counsel, the case was sent to the jury for special verdicts on two questions:[5]

"1. Did the Defendant act in bad faith ... when it decided to terminate the Plaintiff's contract as a salesman by letter dated December 2, 1968, delivered on January 6, 1969?

"2. Did the Defendant act in bad faith ... when the Defendant let the Plaintiff go on June 5, 1970?"

The jury answered both questions affirmatively, and judgment entered in the sum of $45,649.62.[6]

The central issue on appeal is whether this "bad faith" termination constituted a breach of the employment at will contract. Traditionally, an employment contract which is "at will" may be terminated by either side without reason. See *Fenton* v. *Federal St. Bldg. Trust*, 310 Mass. 609,

---

[5] The defendant reserved the right to argue on appeal that the judge should have directed verdicts, and that bad faith was not a proper issue in the case. In the trial court NCR argued that good faith had not been pleaded. This issue is not directly argued in NCR's brief and, therefore, need not be considered. S.J.C. Rule 1:13, as amended, 366 Mass. 853 (1975). We add, however, that we think the pleadings adequate to raise the issue of bad faith.

[6] The amount apparently represented 25% of the commission due during the eighteen months the machines were delivered to First National, and which was paid to Martin, and 100% of the commissions on the machines delivered after Fortune was fired.

612 (1942); *Mechanics Foundry & Mach. Co. v. Lynch,*
236 Mass. 504, 505 (1920); *Gebhard v. Royce Aluminum
Corp.,* 296 F.2d 17, 18-19 (1st Cir. 1961); 9 S. Williston,
Contracts § 1017 (3d ed. 1967); Restatement (Second)
of Agency § 442 (1958). Although the employment at will
rule has been almost uniformly criticised, see Blades, Em-
ployment at Will vs. Individual Freedom: On Limiting the
Abusive Exercise of Employer Power, 67 Colum. L. Rev.
1404 (1967); Blumrosen, Workers' Rights Against Em-
ployers and Unions; Justice Francis — A Judge for Our
Season, 24 Rutgers L. Rev. 480 (1970), it has been widely
followed.

The contract at issue is a classic terminable at will
employment contract. It is clear that the contract itself
reserved to the parties an explicit power to terminate the
contract without cause on written notice. It is also clear
that under the express terms of the contract Fortune has
received all the bonus commissions to which he is entitled.
Thus, NCR claims that it did not breach the contract,
and that it has no further liability to Fortune.[7] According
to a literal reading of the contract, NCR is correct.

However, Fortune argues that, in spite of the literal
wording of the contract, he is entitled to a jury deter-
mination on NCR's motives in terminating his services
under the contract and in finally discharging him. We
agree. We hold that NCR's written contract contains an
implied covenant of good faith and fair dealing, and a
termination not made in good faith constitutes a breach
of the contract.

We do not question the general principles that an em-

---

[7] Damages were, by stipulation of the parties, set equal to the unpaid
bonus amounts. Thus we need not consider whether other measures of
damages might be justified in cases of bad faith termination. Nor do we
now decide whether a tort action, with possible punitive damages, might
lie in such circumstances. See, e.g., Blades, Employment at Will vs.
Individual Freedom: On Limiting the Abusive Exercise of Employer
Power, 67 Colum. L. Rev. 1404, 1421-1427 (1967).

Although the order called for purchase of 2,008 Class 5 machines for
a total sale of $5,040,080, at trial the parties stipulated that "1,503
machines were actually delivered and installed" under the First Na-
tional order. The stipulated damages in the instant case were based on
the number of registers actually delivered and installed.

ployer is entitled to be motivated by and to serve its own legitimate business interests; that an employer must have wide latitude in deciding whom it will employ in the face of the uncertainties of the business world; and that an employer needs flexibility in the face of changing circumstances. We recognize the employer's need for a large amount of control over its work force. However, we believe that where, as here, commissions are to be paid for work performed by the employee, the employer's decision to terminate its at will employee should be made in good faith. NCR's right to make decisions in its own interest is not, in our view, unduly hampered by a requirement of adherence to this standard.

On occasion some courts have avoided the rigidity of the "at will" rule by fashioning a remedy in tort.[8] We believe, however, that in this case there is remedy on the express contract.[9] In so holding we are merely recognizing the general requirement in this Commonwealth that parties to contracts and commercial transactions must act in good faith toward one another. Good faith and fair dealing between parties are pervasive requirements in our law; it can be said fairly, that parties to contracts or commercial transactions are bound by this standard. See G. L. c. 106, § 1-203 (good faith in contracts under Uniform Commercial Code); G. L. c. 93B, § 4 (3) (*c*) (good faith in motor vehicle franchise termination).

---

[8] This theory has generally been utilized in order to protect public policy. See, e.g., *Montalvo* v. *Zamora,* 7 Cal. App. 3d 69 (1970) (employee terminated after having an attorney to negotiate a claim that the employer had violated the minimum wage law); *Petermann* v. *International Bhd. of Teamsters, Local 396,* 174 Cal. App. 2d 184 (1959) (employee discharged for refusing to commit perjury before government commission); *Frampton* v. *Central Ind. Gas Co.,* 260 Ind. 249 (1973) (employee fired for filing a workman's compensation claim); *Nees* v. *Hocks,* 272 Or. 210 (1975) (employee fired for performing jury duty in violation of company policy). Cf. *Geary* v. *United States Steel Corp.,* 456 Pa. 171 (1974) (tort remedy not available where employee fired for not following corporate hierarchy procedure in protesting company policy as to safety of a product).

[9] Thus, we do not reach the issues raised by count 3 for quantum meruit recovery.

A requirement of good faith has been assumed or implied in a variety of contract cases. *Druker* v. *Roland Wm. Jutras Assocs.*, 370 Mass. 383, 385 (1976). *Kerrigan* v. *Boston*, 361 Mass. 24, 33 (1972) (collective bargaining contract). *Murach* v. *Massachusetts Bonding & Ins. Co.*, 339 Mass. 184, 187 (1959) (insurance contract — insurer must exercise discretionary power to settle claims in good faith). *Krauss* v. *Kuechler*, 300 Mass. 346 (1938). *Clark* v. *State St. Trust Co.*, 270 Mass. 140, 153 (1930) (secondary agreement to a stock option agreement). *Elliott* v. *Kazajian*, 255 Mass. 459, 462 (1926) (broker's commission). *Chandler, Gardner & Williams, Inc.* v. *Reynolds*, 250 Mass. 309, 314 (1924) (contracts to be performed to the satisfaction of the other party).

The requirement of good faith was reaffirmed in *RLM Assocs.* v. *Carter Mfg. Corp.*, 356 Mass. 718 (1969). In that case the plaintiff (RLM), a manufacturer's representative of the defendant (Carter), was entitled to a commission on all of Carter's sales within a specified territory. Either party could terminate this arrangement on thirty days' notice. Carter cancelled the agreement shortly before being awarded a contract discovered and brought to Carter's attention by RLM. Because "[t]he evidence permitted the conclusion that Carter's termination of the arrangement was in part based upon a desire to avoid paying a commission to RLM" (*id.*), we held that the question of bad faith was properly placed before the jury. The present case differs from *RLM Assocs.*, in that Fortune was credited with the sale to First National but was fired immediately thereafter. NCR seeks to avoid the thrust of *RLM Assocs.* by arguing that bad faith is not an issue where it has been careful to protect a portion of Fortune's bonus commission under the contract. We disagree. The fact that the discharge was after a portion of the bonus vested still creates a question for the jury on the defendant's motive in terminating the employment.

Recent decisions in other jurisdictions lend support to the proposition that good faith is implied in contracts terminable at will. In a recent employment at will case,

*Monge* v. *Beebe Rubber Co.*, 114 N.H. 130, 133 (1974), the plaintiff alleged that her oral contract of employment had been terminated because she refused to date her foreman. The New Hampshire Supreme Court held that "[i]n all employment contracts, whether at will or for a definite term, the employer's interest in running his business as he sees fit must be balanced against the interest of the employee in maintaining his employment, and the public's interest in maintaining a proper balance between the two. . . . We hold that a termination by the employer of a contract of employment at will which is motivated by bad faith or malice . . . constitutes a breach of the employment contract. . . . Such a rule affords the employee a certain stability of employment and does not interfere with the employer's normal exercise of his right to discharge, which is necessary to permit him to operate his business efficiently and profitably."

We believe that the holding in the *Monge* case merely extends to employment contracts the rule that " 'in *every* contract there is an implied covenant that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract, which means that in *every* contract there exists an implied covenant of good faith and fair dealing' [emphasis supplied]. *Uproar Co.* v. *National Broadcasting Co.*, 81 F.2d 373, 377 (1st Cir.), cert. denied, 298 U.S. 670 (1936), quoting from *Kirke La Shelle Co.* v. *Paul Armstrong Co.*, 263 N.Y. 79, 87 (1933)." *Druker* v. *Roland Wm. Jutras Assocs.*, 370 Mass. 383, 385 (1976). Restatement (Second) of Contracts § 231 (Tent. Drafts Nos. 1-7 (1973). 5 S. Williston, Contracts § 670 (3d ed. 1961).

In the instant case, we need not pronounce our adherence to so broad a policy nor need we speculate as to whether the good faith requirement is implicit in every contract for employment at will. It is clear, however, that, on the facts before us, a finding is warranted that a breach of the contract occurred. Where the principal seeks to deprive the agent of all compensation by terminating the

contractual relationship when the agent is on the brink of successfully completing the sale, the principal has acted in bad faith and the ensuing transaction between the principal and the buyer is to be regarded as having been accomplished by the agent. Restatement (Second) of Agency § 454, and Comment a (1958). The same result obtains where the principal attempts to deprive the agent of any portion of a commission due the agent. Courts have often applied this rule to prevent overreaching by employers and the forfeiture by employees of benefits almost earned by the rendering of substantial services. See, e.g., *RLM Assocs.* v. *Carter Mfg. Corp.*, 356 Mass. 718 (1969); *Lemmon* v. *Cedar Point, Inc.*, 406 F.2d 94, 97 (6th Cir. 1969); *Coleman* v. *Graybar Elec. Co.*, 195 F.2d 374 (5th Cir. 1952); *Zimmer* v. *Wells Management Corp.*, 348 F. Supp. 540 (S.D.N.Y. 1972); *Sinnett* v. *Hie Food Prods., Inc.*, 185 Neb. 221 (1970). In our view, the Appeals Court erroneously focused only on literal compliance with payment provisions of the contract and failed to consider the issue of bad faith termination. Restatement (Second) of Agency § 454, and Comment a (1958).

NCR argues that there was no evidence of bad faith in this case; therefore, the trial judge was required to direct a verdict in any event. We think that the evidence and the reasonable inferences to be drawn therefrom support a jury verdict that the termination of Fortune's twenty-five years of employment as a salesman with NCR the next business day after NCR obtained a $5,000,000 order from First National was motivated by a desire to pay Fortune as little of the bonus credit as it could. The fact that Fortune was willing to work under these circumstances does not constitute a waiver or estoppel; it only shows that NCR had him "at their mercy." *Commonwealth* v. *DeCotis*, 366 Mass. 234, 243 (1974).

NCR also contends that Fortune cannot complain of his firing in June, 1970, as his employment contract clearly indicated that bonus credits would be paid only for an

eighteen-month period following the date of the order.[10] As we have said, the jury could have found that Fortune was stripped of his "salesman" designation in order to disqualify him for the remaining 25% of the commissions due on cash registers delivered prior to the date of his first termination. Similarly, the jury could have found that Fortune was fired (or not assigned to the First National account) so that NCR could avoid paying him *any* commissions on cash registers delivered after June, 1970.

Conversely, the jury could have found that Fortune was assigned by NCR to the First National account; that all he did in this case was arrange for a demonstration of the product; that he neither participated in obtaining the order nor did he assist NCR in closing the order; and that nevertheless NCR credited him with the sale. This, however, did not obligate the trial judge to direct a verdict. Where evidence is conflicting, the rule is clear: "If upon any reasonable view of the evidence there is found any combination of circumstances from which a rational inference may be drawn in favor of the plaintiff, then there was no error in the denial of the motion, even if there may be other and different circumstances disclosed in the evidence which, if accepted as true by the jury, would support a conclusion adverse to the plaintiff." *Howes* v. *Kelman,* 326 Mass. 696, 696-697 (1951).

We think that NCR's conduct in June, 1970 permitted the jury to find bad faith.

NCR also argues that Fortune failed to follow the notice and grievance procedure[11] set forth under the contract.

[10] NCR argues that if the ground for recovery was the fact that Fortune was fired merely for attaining age sixty-two, there is still no basis for recovery. See *Johnson* v. *United States Steel Corp.,* 348 Mass. 168 (1964). We do not consider that issue as it is not raised or litigated. But see Restatement (Second) of Torts § 874A (Tent. Draft No. 23 1977).

[11] The contract provided in pertinent part:

"VI. CLAIMS FOR BONUS CREDIT, LIMITATION OF CLAIMS AND ACTIONS

. . . .

"Objections to the computation of your monthly bonus during your employment or to any monthly statement of your Account, at any time, shall be in writing. If such objection is made within thirty days from the time a statement of such account is furnished to you, or if any

It is clear that these provisions were inserted to settle disputes among salesmen and between a salesman and his branch manager. They are not applicable to termination grievances. Fortune had no dispute either with his branch manager or with Martin. Even if the dispute could be characterized as being between Fortune and Martin, we note that Martin was not a salesman. Assuming, however, the provisions covered terminations, Fortune would have been excused if the fact finders had drawn the inference that NCR would not have complied with its obligations had it received timely notices. The law does not require useless acts. See *Leigh* v. *Rule,* 331 Mass. 664, 668 (1954); *Nevins* v. *Ward,* 320 Mass. 70, 73 (1946); *Schayer* v. *Commonwealth Loan Co.,* 163 Mass. 322, 324 (1895); Restatement of Contracts § 306 Comment a (1932); 5 S. Williston, Contracts §§ 676, 699 (3d ed. 1961). A refusal to pay a sum due under a contract excuses performance of a condition requiring notice. *Jackson & Co.* v. *Great Am. Indem. Co.,* 282 Mass. 337, 342 (1933) (proof of loss to insurance company). *United States* v. *Conti,* 64 F. Supp. 187 (D. Mass.), aff'd 158 F.2d 581 (1st Cir. 1946) (notice of contract termination). Where an employer repudiates or nullifies procedures established by the contract, the employee is excused from performance of the conditions imposed on him. *Balsavich* v. *Local 170, International Bhd. of Teamsters,* 371 Mass. 283, 286 (1976). See Re-

error is discovered by us within such period, adjustment shall be made for that month if you are then employed by us. If you are not then employed by us or if your objection is made later than thirty days, or if the error is not discovered by us within such period, the adjustment shall be made in the month when your claim is approved by us or in the month when the error is discovered by us if the same was not brought to our attention by you."

"SPECIAL COVENANTS

. . . .

"*B.* SETTLEMENT OF BONUS DISPUTES You agree to permit the head of our Sales Division or the person designated by him to arbitrate any controversy between you and any other salesman, or between you and your Branch Manager, concerning the bonus credit which may be properly due you or such other salesman on any customer's order and the decision made in such controversy shall be final."

statement of Contracts § 302 (1932); 3A A. Corbin, Contracts § 759 (1960). Accordingly, the trial judge was not required to direct a verdict on Fortune's failure to comply with the notice and grievance procedure of the contract.[12]

Finally, NCR argues that Fortune is not entitled to recover because he failed to bring his suit within two years after the cause of action accrued as required by the contract.[13] We note that NCR did not raise the shorter limitation period in its answer or amended answer as required by Mass. R. Civ. P. 8 (c), 365 Mass. 749 (1974). Moreover, the shorter limitation period was not argued to the trial judge. Accordingly, we need not decide whether Fortune was also excused from this contractual requirement as this claim is not properly before us. See *Kagan* v. *Levenson*, 334 Mass. 100, 106 (1956), and cases cited. In view of the jury's finding of bad faith we think any reliance by NCR on this provision would be of no avail. There was no error.

> *Judgment of the Superior Court affirmed.*

---

[12] We note, under this provision, NCR would be both a party to the grievance procedure and the judge of it. This fact alone may well excuse an aggrieved employee from using it or a court from enforcing it. "It is contrary to natural right and fundamental principles of the common law for one to judge his own cause." *Patton* v. *Babson's Statistical Organization, Inc.*, 259 Mass. 424, 428 (1927), quoting from *Brocklehurst & Potter Co.* v. *Marsch*, 225 Mass. 3, 8 (1916).

[13] The contract provided in pertinent part:
"VI. CLAIMS FOR BONUS CREDIT, LIMITATION OF CLAIMS AND ACTIONS
. . . .
"No action at law or in equity shall be brought on any claims arising out of or in any way connected with this contract prior to the expiration of sixty days after you notify us in writing of the basis of your claims, nor shall any such action be brought at all unless brought within two years from the time the same accrues."