# United States Court of Appeals
## For the First Circuit

No. 13-2330

THOMAS LOCKE,

Plaintiff, Appellant,

v.

US AIRWAYS, INC.,

Defendant Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Rya W. Zobel, U.S. District Judge]

Before

Lynch, Chief Judge,
Howard and Kayatta, Circuit Judges.

Christopher J. Trombetta for appellant.
Christopher J. Campbell, with whom Jackson Lewis P.C. was on brief, for appellee.

August 20, 2014

**HOWARD, Circuit Judge**.  After Thomas Locke, a US Airways mechanic at Logan International Airport, was discovered pilfering company property, he entered into a "Last Chance Agreement" with US Airways.  Locke's "last chance" at continued employment failed to materialize, however, after Logan Airport authorities denied his application for renewal of his security badge.  Locke now appeals the district court's grant of summary judgment on his claim that US Airways breached the Last Chance Agreement by influencing the airport's decision to deny his badge and by preventing him from transferring to Philadelphia International Airport.  Finding no triable basis for these contentions in the record, we affirm.

## I.

In August 2009, US Airways received phone calls reporting ongoing theft from its aircraft and identifying Locke as the culprit.  Michael Bashar, US Airways' station director at Logan Airport, responded by enlisting the assistance of the Massachusetts State Police.  The State Police conducted surveillance outside the US Airways hangar, and on September 18, 2009, observed Locke exiting the hangar while carrying a large trash bag and a cooler.  Two officers stopped Locke in the parking lot, and Locke agreed to accompany them to the police barracks.  After reading Locke his Miranda rights, the police interviewed him and searched the cooler and trash bag, finding sodas, beers, sandwiches, soap, toilet paper, and several other items taken from aircraft.  Locke admitted

-2-

to filching the items. The officers released Locke but retained his security badge, which granted him access to secure areas of Logan Airport.

Later that evening, Locke called his supervisor, Robert Andrews, and informed him that the State Police had caught him taking items from aircraft and had confiscated his security badge. The following Monday, September 21, Andrews told his supervisor, Nelson Conarroe (the Regional Director of Technical Operations), about the incident, and suspended Locke pending further investigation.

The airline had little time to investigate, however. Under the terms of a collective bargaining agreement between US Airways and the International Association of Machinists, US Airways was obligated to make a disciplinary decision within five days of the underlying incident -- in other words, by September 23. With this deadline looming, US Airways entered into a "Last Chance Agreement" (the "Agreement") with Locke on September 23 "[i]n lieu of termination and in order to provide [Locke] a final opportunity to demonstrate his ability to comply with Company policies and procedures." The Agreement provided for Locke's return to work on October 16, 2009, but stated that "reinstatement [was] contingent upon completion of any pre-employment steps required by law, Company policy, or the terms of this Agreement, including, if applicable, a security screening." The Agreement also empowered US

-3-

Airways to convene a meeting with Locke to determine whether he had violated its terms; any such determination would be "final and binding with respect to whether [Locke] violated the terms of this Agreement, and the imposition of discipline, up to and including termination."

In order to return to work at Logan, Locke needed a security badge. Locke testified that he sought to reobtain his original badge from the State Police as early as September 21, on which date Andrews told Locke that he would go to the police barracks and pick up the badge. After Andrews apparently met with no success, Locke himself went to the office of the badging authority, MassPort, on October 14. Locke was informed that his badge had been lost and that he would need to reapply for a new badge by filling out an application and obtaining a signature from US Airways. Following these instructions from MassPort, Locke filed a badge application the next day, October 15, with a US Airways signature on the application form.[1]

On November 3, Major Michael Concannon, MassPort's Director of Aviation Security, issued a letter informing Locke that his badge application had been denied and explaining the basis for the denial. The letter recited the details of Locke's September 18

---

[1] Although the application form itself was not placed in the record, and although the parties did not address this fact in their briefs, deposition testimony suggested that a "denied" notation was placed on Locke's application on or around October 16.

encounter with the State Police and his admission of theft, and concluded:

> Holding a Security Badge for Boston-Logan International Airport is a privilege, and the security of the Airport depends in large part on the Authority being able to trust that Security Badge holders will faithfully discharge the security responsibilities that attend that privilege. Your admission that you have been conducting an ongoing criminal enterprise at the Airport vitiates that trust and renders you unfit to hold a security badge for Boston-Logan International Airport.

Meanwhile, on the advice of Conarroe, Locke also applied for a comparable mechanic position with US Airways at Philadelphia International Airport. Locke received this position on November 5. However, although Conarroe promised Locke that he would receive a security badge at Philadelphia International, Locke never in fact obtained such a badge and never began work in Philadelphia.

On November 10, Locke met with Andrews, a union representative, and (via telephone) Conarroe to discuss whether Locke had complied with the terms of the Agreement. Conarroe inquired whether Locke had obtained a security badge, and when Locke admitted that he had not, Conarroe provided him until the end of the week (November 13) to do so. On November 13, Conarroe sent Locke a letter stating that he had violated the terms of the Agreement and terminating his employment forthwith. Conarroe's letter explained:

-5-

Under the terms of the Agreement you were required to return to work on October 16, 2009. The Agreement also provided that your reinstatement was contingent upon completion of any pre-employment steps required by law, Company policy, or the terms of this agreement, including a security screening. You failed to obtain the required BOS Airport Identification Badge and failed to return to work on October 16, 2009.

Thereafter, Locke filed this suit, alleging breach of contract, breach of the implied covenant of good faith and fair dealing, and wrongful termination. US Airways moved for, and the district court granted, summary judgment on all three counts.[2] This appeal followed.

## II.

On appeal, Locke challenges the district court's grant of summary judgment only as to his claims for breach of contract and breach of the implied covenant of good faith and fair dealing; he does not press his wrongful termination claim. We review the district court's summary judgment order de novo; "[i]n so doing, we draw all reasonable inferences in favor of the non-moving party while ignoring conclusory allegations, improbable inferences, and unsupported speculation." Alicea v. Machete Music, 744 F.3d 773, 778 (1st Cir. 2014) (internal quotation marks and alterations omitted). To withstand summary judgment, Locke must therefore

---

[2] The court first rejected US Airways' argument that Locke's state-law claims were preempted by the Railway Labor Act, 45 U.S.C. § 151 et seq. US Airways does not press that argument before us.

"present definite, competent evidence" in support of his claims;
"bald assertions, empty conclusions, rank conjecture, or vitriolic
invective" will not suffice.  <u>Pina</u> v. <u>Children's Place</u>, 740 F.3d
785, 795-96 (1st Cir. 2014) (internal quotation marks omitted).
Proceeding in reverse order, we first address Locke's claim for
breach of the implied covenant of good faith and fair dealing.

### A.    Good Faith and Fair Dealing

The district court made quick work of Locke's good faith
and fair dealing claim, recognizing that although Massachusetts law
implies a covenant of good faith and fair dealing in every
contract, in the employment context this doctrine provides merely
that "an employer is accountable to a discharged employee for
unpaid compensation if the employee were terminated in bad faith
and the compensation is clearly connected to work already
performed."  <u>Harrison</u> v. <u>NetCentric Corp.</u>, 744 N.E.2d 622, 629
(Mass. 2001); <u>see</u> <u>also</u> <u>Fortune</u> v. <u>Nat'l Cash Register Co.</u>, 364
N.E.2d 1251, 1257 (Mass. 1977).[3]  Because Locke nowhere alleged a
failure to compensate him for work he had already performed, the
district court found this claim baseless.  On appeal, Locke mounts
no meaningful challenge to this conclusion, and our own review of
Locke's complaint reveals no basis for this claim.  We accordingly
affirm the district court's grant of summary judgment as to Locke's

---

[3]  Although the Agreement specified that it was to be governed
by Arizona law, the parties have proceeded under Massachusetts law.

-7-

claim for breach of the implied duty of good faith and fair dealing.

### B. Breach of Contract

Locke advances two distinct theories as to how US Airways breached the Agreement, arguing that the airline 1) interfered with his application for a security badge at Logan Airport and 2) precluded him from transferring to an airport in Philadelphia, where Locke avers that he could have easily gained security clearance. We address each theory in its turn.

#### 1. Badge Application

The November 13 letter from Nelson Conarroe terminated Locke for failing to obtain a security badge and for failing to return to work on October 16, the date specified in the Agreement. Locke primarily argues that his inability to obtain a badge was due to wrongful interference from Bashar, the station director, placing US Airways in breach of the Agreement. Initially, however, Locke raises the broader contention that the Agreement did not require him to obtain a badge by any particular date and therefore furnished no ground for his termination on November 13. We address each issue separately.

##### a. Deadline to Obtain Badge

Locke correctly points out that the Agreement did not expressly state a deadline for him to obtain his badge.

Nevertheless, such a deadline is plainly implied from the following paragraph of the Agreement:

> Concurrent with Employee's reinstatement to his former position, Employee's personnel file will reflect a disciplinary suspension without pay from Sept 19, 2009 through employees [sic] return to work, October 16, 2009. Employee and the Union understand and agree that reinstatement is contingent upon completion of any pre-employment steps required by law, Company policy, or the terms of this Agreement, including, if applicable, a security screening.

Locke implores us to read these adjacent sentences in hermetic isolation, arguing that the time period in the first sentence "refers only to the length of the suspension and not the date by when any pre-employment steps must be completed" and that the second sentence in turn "does not indicate that the steps must be completed by a particular date." This is too strained a reading. The first sentence specifies October 16 as the date of Locke's "return to work"; the second sentence renders reinstatement conditional upon completion of a security screening and other pre-employment steps. The only reasonable inference is that these steps had to be completed by the date of reinstatement, i.e., October 16.

A cursory review of the Agreement's backdrop compels the same conclusion. See generally McAdams v. Mass. Mut. Life Ins. Co., 391 F.3d 287, 299 (1st Cir. 2004) (under Massachusetts law, "agreements should be construed with reference to the situation of

the parties when they made it and to the objects sought to be accomplished" (internal quotation marks omitted)).  The undisputed testimony of Robert Andrews, Locke's supervisor, established that the badge was necessary for Locke to access the secure areas where he worked.  Indeed, Locke himself testified that his reinstatement was contingent upon obtaining a security badge.  Because a security badge was a sine qua non of Locke's return to work both under the language of the Agreement and under airport security policies, the Agreement is properly construed as requiring Locke to obtain a badge by October 16, the date of his return.

### b.    Bashar's Interference

Locke's contention that Bashar foiled the issuance of his security badge and thereby placed US Airways in breach of the Agreement warrants a somewhat lengthier analysis.  At the outset, we note that Locke identifies no specific provision of the Agreement violated by Bashar's alleged interference. Nevertheless, we accept the underlying premise that if US Airways prevented Locke from obtaining his security badge, US Airways could not then terminate Locke for failing to obtain a badge.  See Lobosco v. Donovan, 565 N.E.2d 819, 821 (Mass. App. Ct. 1991) ("[A] promisor may not avoid his promised performance based on the nonoccurrence of a condition, where the promisor has himself hindered or prevented its occurrence."); see also Riqs v. Sokol, 61 N.E.2d 538, 542 (Mass. 1945); Restatement (Second) of Contracts § 245 & cmt. a,

illus. 1 (1981).  In other words, US Airways could not circumvent its obligations under the Agreement simply by making a badge unattainable and thereby preventing Locke from fulfilling a condition of his reinstatement.

That said, the record evidence is insufficient for a reasonable jury to conclude that the badge denial was in fact attributable to Bashar and, by extension, to US Airways.[4]  Although Locke points to evidence showing that Bashar personally opposed his badge application, he fails to establish a triable issue on whether MassPort ultimately denied his badge application for that reason rather than because of independent security concerns.

Locke's claim rests primarily on an email exchange between Bashar and MassPort security officials a few days prior to the November 3 badge denial.  On the evening of October 30, Bashar received the following email from Captain Richard Lane of the State Police:

> The Major received a phone call from LtCol Smith, MSP Field Services, inquiring why we (MSP) will mt [sic] give Mr. Locke his "badge back" since he has served his "two week suspension" and "US Air wants Mr Locke back at work." . . . LtCol Smith still insists that Major Concannon send him an email on Monday morning on whether or not "we are going to give Mr Locke his badge back."

---

[4]  In light of our ultimate conclusion that Bashar had no influence on MassPort's decision, we do not address the potentially vexing question of whether the challenged actions of Bashar, a US Airways employee, were properly attributable to US Airways and therefore placed the company in breach of the Agreement.

> I need to know if USAir's position has
> changed on this issue.  If it has not, then
> the Aviation Security Director's [i.e.,
> Concannon's] position will remain unchanged.

Bashar replied late the following evening that "USAirways is okay with returning Tom Locke's airport badge back to him."  Roughly ten minutes later, Lane sent the following reply, copying Concannon and others on the email:

> This sudden change in position is
> extremely disturbing.  However, if USAir wants
> Tom Locke to have a SIDA badge he must re-
> apply with USAir as the sponsor.  The process
> does not allow a badge to simply be re-issued
> in this matter.  Locke was removed from the
> system because he was arrested for offenses
> committed on Massport property over a
> significant amount of time.
> His badge was taken because the
> Aviation Security Director has concerns that
> someone who would commit such crimes could
> also be compromised on security.
> When and if Locke's application for a
> SIDA badge is filed it will be processed
> accordingly.

Bashar then replied approximately an hour later:

> I do not support the decision to return Tom
> Locke's badge.  I was informed by USAirways
> labor relations department responsible for the
> maintenance department that once a decision
> was make [sic] I did not have the authority to
> prevent him from getting a SIDA badge.
> If you could hold off processing his
> badge until I have a chance to talk to our
> legal department on Monday I would appreciate.

Bashar spoke to US Airways' labor relations department the next day (Monday, November 2) and was told that it was "okay for [Locke] to come back"; Bashar then passed this information along to Lane on

the same day. Concannon issued the letter denying Locke's badge application on the following day, November 3.

Locke places great weight on Bashar's statement in the final email that he "[did] not support the decision to return Tom Locke's badge" and on Bashar's accompanying request that the badge processing be held off. In his brief, he further claims that "[t]he Massachusetts State Police had indicated that Mr. Bashar's direction would mandate that a badge would not be issued" and that Concannon "acknowledged that Mr. Bashar's opposition . . . had been a 'cause' of the non-issuance of the badge."

These latter allegations are unsupported in the record, however, leaving Locke unable to establish a causal nexus between Bashar's email and MassPort's decision to deny his badge application. Although the record provides some tepid support for the proposition that US Airways' position was germane to the badging decision, there is no indication that Bashar's personal view had any bearing. Indeed, Bashar himself stated in the allegedly impugning email that he "did not have the authority to prevent [Locke] from getting a SIDA badge" once US Airways had made a decision to support Locke's application. Nor did Bashar's correspondence suggest that US Airways opposed badge issuance; in

-13-

fact, Bashar reported that US Airways was "okay with returning Tom Locke's airport badge back to him."[5]

Concannon's deposition testimony, upon which Locke also relies, undermines rather than supports Locke's case. Concannon initially testified that at the time he signed the letter denying Locke's badge application, his "memory [was] that U.S. Air was still discussing internally what its position was, and . . . its

_____

[5] At oral argument, Locke suggested that the very fact that Lane emailed Bashar to inquire whether "USAir's position ha[d] changed" indicates that Bashar's response was germane to MassPort's decision. That inference is sensible, but Locke again fails to distinguish between the airline's position and Bashar's own opinion. Bashar answered Lane's question unequivocally in his first email, indicating that the airline was "okay" with returning Locke's badge. The dissenting personal view voiced in Bashar's second email did not bear on the topic of Lane's inquiry, to wit, "USAir's position" on badge issuance.

To be sure, MassPort does not appear to have understood at all times that US Airways supported Locke's application. As we have set forth above, after Bashar responded that US Airways was "okay" with returning Locke's badge, Lane replied, "This sudden change in position is extremely disturbing" -- suggesting, of course, that MassPort officials previously thought that US Airways opposed badge issuance. Concannon also recollected a change of position by US Airways on sponsorship: "I do recall some information that U.S. Airways would not be sponsoring Mr. Locke, and at some point, I think there was a change of heart and then perhaps even another one after that." Similarly, Lieutenant Anthony Bille, also of the Massachusetts State Police, testified that although he "wasn't privy to [US Airways'] internal discussions," he "kn[e]w there was some sort of conflict" within the company regarding Locke's badge application. But Locke proffers no theory as to why US Airways was initially perceived as opposing badge issuance, nor does the record support anything more than speculation on this question. This ambiguity, while perplexing, therefore does not suffice to defeat summary judgment. Nor are we in any event convinced that MassPort's initial understanding of the airline's position was relevant to its ultimate decision, as Bashar's email made clear that the airline did support Locke's application (hence the "sudden change in position").

-14-

position may have had some impact on [his] decision, but [he] did not make a decision solely based on what U.S. Air would or wouldn't do." He then clarified:

> Mostly I would say if there was no sponsoring company, the point would be moot, and I wouldn't even have to make a decision because they were still discussing internally what their position was and whether they would actually sponsor Mr. Locke to get his badge back. I made a decision based on security.

Concannon further explained that "the Aviation Security Director's position" alluded to in Lane's first email was that Concannon "was not in favor of giving Mr. Locke his badge back at that point"; that even if US Airways consistently supported Locke's badge application, that would not have required Concannon to issue a badge; and that the badging decision was based on Concannon's "independent judgment as to whether or not [Locke was] a security risk" and on his "consulting with MassPort personnel" on this question.[6] Presented with the email chain between Bashar and MassPort, Concannon stated that "[t]he implication of Mike Bashar's email to Rich Lane on November 1st [was] that U.S. Airways would have been okay with Tom Locke getting a badge back" and that except for Bashar's "personal opinion," nothing in the email chain indicated opposition to the badge from US Airways. Concannon

---

[6] Lieutenant Bille echoed Concannon's testimony on this point, stating that US Airways "had minimal effect" on the badging decision by MassPort and the State Police, and that the decision was "independent of the airway's or vendor's view on the matter . . . [b]ecause security [was] of the essence."

further testified that Locke's October 15 badge application, signed by the Badge Coordinator for US Airways, indicated that the airline was sponsoring Locke's application.

This evidence lends no support to Locke's theory that the denial of his badge was traceable to any malign meddling of Bashar. Bashar's emails clearly distinguished US Airways' institutional support for Locke's application from his contrary personal opinion, which he acknowledged could not prevent badge issuance. And although Concannon initially suggested that US Airways' position "may have had some impact" on his decisionmaking, he proceeded to explain that the airline would primarily impact his decision if it declined to sponsor Locke, such that "the point would be moot, and [he] wouldn't even have to make a decision." That was not the case here. Locke submitted an application signed by US Airways' Badge Coordinator, and Bashar's emails informed MassPort that the airline supported Locke's application despite Bashar's own dissenting view. Moreover, after asking MassPort to "hold off processing [Locke's] badge" while he spoke to the legal department, Bashar followed up with MassPort the very next day, informing Lane that the labor relations department had told him that it was "okay for [Locke] to come back." Therefore, the summary judgment record reveals no contradiction to Concannon's testimony that he ultimately "made a decision based on security" that Locke might exploit at trial. Locke's contrary belief that Bashar orchestrated the denial of his

application ultimately amounts to no more than that -- an unsupported belief that need not be credited at summary judgment. See Alicea, 744 F.3d at 778.[7]

## 2. Philadelphia Transfer

Locke alternatively avers that US Airways breached the Agreement by preventing his transfer to Philadelphia International Airport, where Locke obtained a comparable mechanic position with US Airways. More specifically, Locke contends that the Agreement "did not mandate that [he] needed to work at Logan" and that by terminating Locke after he had obtained the Philadelphia position, the airline breached its contractual obligation to reinstate Locke "upon completion of any pre-employment steps."

Once again, however, Locke's theory lacks an adequate foundation in the record. The apposite evidence comprises only 1)

---

[7] Locke also cites his own testimony that Andrews informed him on October 14 that Bashar was "wrongfully and without reason . . . holding [his] badge back" and that Conarroe told him in late October that Bashar had been preventing the issuance of the security badge at Logan. Even assuming arguendo that these statements are admissible nonhearsay under Fed. R. Evid. 801(d)(2)(D) (statements of an opposing party's employees), they are in themselves "bald assertions [and] empty conclusions" that need not be credited at summary judgment. Pina, 740 F.3d at 795 (internal quotation marks omitted). Locke only offered Andrews's and Conarroe's conclusory remarks that Bashar was preventing the issuance of a badge, with no explanation of how Bashar did so. Indeed, Locke conceded that his "only basis . . . for saying that Mr. Bashar was preventing [him] from getting the badge was Bob Andrews telling [him] that Bashar was preventing it." Nor did Andrews or Conarroe themselves offer any corroborating testimony on this point. Without further context and detail, these statements raise no genuine factual questions precluding summary judgment.

Locke's testimony in an affidavit that he applied for and received the position on the advice of Conarroe, who promised that he would receive a security badge in Philadelphia; and 2) general testimony of Matthew Ellis-Drackett, a badging officer at Philadelphia International, concerning that airport's security badging procedures. Although Locke suggests that he would have received a security badge at Philadelphia International, he nowhere indicates that he actually obtained such a badge.[8] Nor does he argue that this failure to obtain a badge was somehow the fault of US Airways, as he claims was the case at Logan Airport. With no evidence, then, that Locke completed the vital "pre-employment step" of obtaining a security badge at Philadelphia International, Locke's argument that US Airways was contractually obligated to reinstate him in Philadelphia is a nonstarter.

More fundamentally, even if Locke _had_ obtained a security clearance in Philadelphia, the Agreement itself furnishes no basis for Locke's claim that he was entitled to transfer to another airport. The Agreement spoke of Locke's "reinstatement to his

_____

[8] Even Locke's contention that he _would_ have received a badge in Philadelphia lacks a sufficient basis in the record, resting on little more than "unsupported speculation." Alicea, 744 F.3d at 778. In discussing badging procedures, Ellis-Drackett did not address the particular facts of Locke's case, only the airport's general practices. And although Locke testified that Conarroe promised him that he would receive a badge in Philadelphia, there is no indication that Conarroe had any influence on the badging decision in Philadelphia; on the contrary, Ellis-Drackett testified that Conarroe was "not an authorized signer" for US Airways badge applicants at Philadelphia International.

former position," not his transfer to a new position. Furthermore, if US Airways believed that Locke had failed to comply with the Agreement's terms, the Director of Maintenance (i.e., Conarroe) was empowered to conduct a meeting with Locke to determine whether the Agreement had been violated. Conarroe's ultimate determination was to be "final and binding with respect to whether [Locke] violated the terms of th[e] Agreement." Conarroe held such a meeting with Locke on November 10, and thereafter terminated Locke for "fail[ing] to obtain the required BOS Airport Identification Badge." That determination is conclusive under the terms of the Agreement, regardless of whether Locke personally believes that a transfer to Philadelphia would also have satisfied the Agreement.

## C.    Miscellany

We briefly address the potpourri of additional issues alluded to in Locke's brief. Locke contends that US Airways decided to terminate him in response to allegedly "defamatory" news articles "indicat[ing] that Mr. Locke's behavior made Logan unsafe . . . [and] that his acts suggested that terrorist activities could occur at the airport." Other than the articles themselves, however, Locke cites no evidence indicating that the news coverage in any way influenced US Airways' decisionmaking or that the airline's stated basis for terminating Locke (failure to obtain a security badge) was somehow pretextual.

Locke's statement of facts also contains a number of quasi-argumentative assertions, alleging, for instance, that "[t]he removal of items from the hangar by Mr. Locke . . . stems from a practice approved by the airline for more than twenty-five years"; that the State Police failed to investigate "whether Mr. Locke had removed articles from the US Airways hangar area on any occasions other than September 18, 2009," from which Locke infers that "Massport simply relied on US Airways request that Mr. Locke not receive a security badge"; and that the State Police "always issue badges to employees whose airline employers support their issuance." Locke fails, however, to meaningfully develop these allegations in the argumentative section of his brief. They are, accordingly, waived. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).

## III.

For the foregoing reasons, we **affirm** the district court's order granting US Airways' motion for summary judgment.